# MARK et al., Appellants, v. H. D. WILLIAMS COOPERAGE COMPANY.

## Division One, May 29, 1907.

1. **PLEADING: Requirements: Counterclaim: Proof.** The Code of Civil Procedure contemplates that pleadings shall be in writing and signed by counsel; that a cause of action shall be stated in a plain and concise way, consisting of acts constituting it; that no allegation shall be stated which the law does not require to be proved, and that only substantive facts shall be stated. And the converse inevitably obtains, namely, that material facts not in writing shall not be proved at the trial, that proof and allegations must correspond, and that no recovery can be had on a new or different cause of action than that marked out in the written pleadings. And these rules apply to counterclaims as well as to petitions.

2. ———: ———: ———: ———: **Recovery in Excess of Allegations.** The defendant cannot recover on his counterclaim damages in excess of the amount specified in the answer, and for things not marked out by his specifications or general allegations, although his proof shows further or extraneous damages.

3. ———: ———: ———: ———: ———: **Amendment: Countervailing Proof.** But had he amended his answer before, during or after trial to conform to his proof, or if plaintiff adopted defendant's new issues as within the answer and offered countervailing proof on such extraneous issues and joined in submitting them to the jury (or court), the judgment for defendant in excess of the amount originally pleaded, or for the elements of damages not originally pleaded, may take on a different form of appeal.

4. **SALES: Uses to Which Article is to be Put: Damages: Proof.** The answer charges that plaintiffs knew that the pipe ordered was to be used in defendant's new cooperage plant in drying its cooperage stuff, and so knowing undertook to sell and did sell such pipe as would be fit for such particular use, and that defendant bought the pipe under a warranty to that effect and installed it, relying on the contract and in ignorance of its faults.     *Held*, that the answer was sufficient to authorize a judgment against plaintiffs for consequential damages for failure to perform their duty, such as loss in having to shut down the factory, loss of staves made worthless, etc.; but to sustain such judgment there must have been either an express warranty, or there must have been such proof that plaintiffs knew

the particular use to which the pipe was to be applied and undertook to furnish pipe suitable to that use as amounts to an implied warranty; and in this case there is no such proof.

5. ———: ———: **Implied Warranty: Trust.** Where the seller contracts to sell pipe to be applied to a particular use, so that the buyer necessarily trusts to the judgment of the seller, and does not rely upon his own judgment, there is an implied warranty that the pipe shall be reasonably fit for that purpose; and if it fails to measure up to that standard, the buyer may recover consequential damages.

6. ———: ———: ———: **Damages.** Damages that may be recovered by the buyer for a breach of the seller's implied warranty are of two kinds: first, such as arise naturally, according to the usual course of things, such as, for instance, where the article is retained, the difference between its actual value at the time of the sale at the place of delivery and what its value would have been if it had been as warranted; second, such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach. Damages of the second class are consequential, and if the pipe sold was to be fit for supplying steam heat to kilns for drying staves manufactured by a cooper, and it proves unfit for that use, without negligence on the buyer's part, the seller is liable for the damage.

7. ———: ———: ———: ———: **Proof.** If the seller knew nothing of the particular use to which the pipe was to be applied, he did not contract with a view to that use, and, hence, there was no implied warranty and the buyer is not entitled to consequential damages from the seller, even though the pipe proves wholly unfit for the use the buyer had in mind when he bought it.

8. ———: ———: **Knowledge of Unfitness.** Where the defects in the pipe became fully known to the buyer while it was being installed in his plant, he cannot breed and multiply actionable damages against the seller by a use thereof through a year or longer.

9. ———: **Loss of Purchased Article.** Where the pipe was to be delivered at East St. Louis and there reloaded and then shipped to defendant's plant in Missouri, the buyer cannot recover for any shortage in the pipe which occurred after the reshipment in East St. Louis.

10. ———: **Discounts: Decimal and Common Fractions.** Where both decimal and common fractions were plainly used and set down in the correspondence in regard to the prices and discounts, and the proof shows that under the trade usage discounts were expressed by using indifferently both kinds of

fractions, the buyer may not, in the absence of fraud or deceit, predicate a defense to the price claimed by the seller, upon his own failure to recognize, or comprehend the office of, a decimal point or decimal fraction when he saw it.

Appeal from Butler Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED.

*McKeighan & Watts, J. P. McBaine* and *L. R. Thomason* for appellants.

(1) What respondent thought the figures describing the discount meant is not material. It accepted the offer and is bound by its terms. Expressed intention only is considered in determining whether the parties' minds met, and the unexpressed or secret intention of one party cannot change the obligation. The price of the pipe can only be calculated by the application of the decimal fraction used by appellants to describe the discount and not by considering the figures used to describe the decimal as two separate discounts. 1 Parsons on Contracts (9 Ed.), 511, note 1; 20 Am. and Eng. Ency. Law (2 Ed.), 913; Moffett-Hodgkins Co. v. Rochester, 91 Fed. 28; Mansfield v. Hodgdon, 147 Mass. 304; Brewington v. Mesker, 51 Mo. App. 348; Easterly Harvesting Mach. Co. v. Crisnell, 38 Mo. App. 471; McCormick v. Lynch, 69 Mo. App. 524; Hambelt Bros. v. Mill Company, 77 Mo. App. 672; Benn v. Pritchett, 163 Mo. 571. (2) In those cases (a) where a manufacturer sells a described and defined article manufactured by him, and does not undertake to supply a buyer, relying upon him to furnish an article suitable for a particular purpose, though the manufacturer has knowledge of the purpose for which the buyer intends to use it; or, where (b) a manufacturer sells an article made by himself, by description or trade name without knowledge on his part of the particular purpose for

which the buyer intends to use it, there is no implied
warranty that the article so sold is suitable for the pur-
pose for which the buyer intends to use it. 2 Mechem
on Sales, p. 1160; Burdick on Sales, p. 106; Benjamin
on Sales (6 Ed.), p. 624; Jones v. Padgett, 24 Q. B. Div.
650; Seitz v. Brewers Refrigerating Co., 141 U. S. 510;
Pullman Palace Car Co. v. Railroad, 157 U. S. 94; Davis
Calyx Drill Co. v. Mallory, 137 Fed. 332; Grand Avenue
Hotel Co. v. Wharton, 79 Fed. 43; Morris v. Bradley
Fertilizer Co., 64 Fed. 55; Ottowa Bottle & Glass Co.
v. Gunther, 31 Fed. 208; Talbot Paving Co. v. Gorman,
103 Mich. 403; Milwaukee Boiler Co. v. Duman, 87
Wis. 120; Ivans v. Laury, 67 N. J. Law 153; Gatchet v.
Warren, 72 Ala. 288; Lukens v. Freiund, 27 Kan. 664;
White v. Oakes, 88 Me. 367; Beck v. Sheldon, 48 N. Y.
365; Warren Glass Works v. Keystone Coal Co., 65
Md. 547; Gregg v. Page Belting Co., 69 N. H. 247;
Wilson v. Lawrence, 139 Mass. 318; Port Carbon Iron
Co. v. Graves, 68 Pa. St. 149; Berthold v. Seevers Mfg.
Co., 89 Iowa 506; Bancroft v. San Francisco Tool Co.,
120 Cal. 228; Oil Creek Gold Min. Co. v. Fairbanks-
Morse Co., 19 Colo. App. 142; Goulds v. Brophy, 42
Minn. 109; Dickson v. Jordan, 11 Ired. Law 166; Bur-
brow & Hearne Mfg. Co. v. Cuming, 35 App. Div. 376;
Peoria Grape Sugar Co. v. Turney, 175 Ill. 631; Jarecki
Mfg. Co. v. Kerr, 165 Pa. St. 529; Fairbanks, Morse &
Co. v. Baskett, 98 Mo. App. 53. (3) And also in cases
where, from the circumstances of the sale of the goods
by a manufacturer, the law implies a warranty that
the goods are of good quality and suitable for a par-
ticular purpose, and the purchaser after inspecting
the goods learns that they are defective and not suit-
able for the purpose for which they were bought and
thereafter uses them for the purpose intended, the
purchaser using the goods under such circumstances
cannot, in an action by the manufacturer for the price
of the goods, recover from the manufacturer damages

for injuries sustained by reason of the defects or unfitness of the goods. Loss by reason of the use of goods which he knew were defective and unsuitable must fall upon the purchaser. 2 Joyce on Damages, sec. 1660, p. 1711; 1 Sutherland on Damages (3 Ed.), sec. 89, p. 261; 30 Am. and Eng. Ency. Law (2 Ed.), 223; Haysler v. Owen, 61 Mo. 270; Harrison v. Railroad, 88 Mo. 625; Fisher v. Goebel, 40 Mo. 475; Tower v. Pauley, 76 Mo. App. 287; Callahan v. Morse, 37 Mo. App. 189; Dietrich v. Railroad, 89 Mo. App. 36; Peck & Co. v. K. C. Metal R. & C. Co., 96 Mo. App. 212; Nye v. Iowa City Alcohol Works, 51 Iowa 129; Berthold v. Seevers Mfg. Co., 89 Iowa 506; Bruce v. Fiss, Doerr & Carroll Horse Co., 47 N. Y. App. Div. 273; Long & Smith v. Clapp, 15 Neb. 17; Gale Sulky Harrow Mfg. Co. v. Moore, 46 Kan. 324; Brush v. Smith, 111 Iowa 217; Bates v. Fish Bros. Wagon Co., 50 N. Y. App. Div. 38, 169 N. Y. 587; Nashua Iron & Steel Co. v. Brush, 91 Fed. 213; Hitchcock v. Hunt, 28 Conn. 343. (4) Nor should respondent recover on its counterclaim any part of the purchase price of the pipe. Where goods are sold without an express warranty, inspected by the purchaser, known to be inferior in quality to the goods bought and thereafter accepted and used, the purchaser cannot, in an action for the purchase price, set up that they were not of the quality bought. Acceptance of goods under such circumstances, where there is not an express warranty, precludes the purchaser from thereafter complaining of the quality of the article accepted. 30 Am. & Eng. Ency. Law (2 Ed.), 209; 2 Mechem on Sales, sec. 1392, p. 1204; New Era Mfg. Co. v. O'Reilly, 95 S. W. 322; Waterworks v. Joplin, 177 Mo. 496; Redlands Orange Growers Assn. v. Gorman, 161 Mo. 203; Lamar Water & Electric Light Co. v. City of Lamar, 140 Mo. 145; Graff v. Foster, 67 Mo. 512; Stevens v. McKay, 40 Mo. 224; Lee v. Bangs, 43 Minn. 23; McClure v. Jefferson, 85 Wis. 208; Jones v. McEwen, 91 Ky. 373;

Pierson v. Crooks, 115 N. Y. 539; Williams v. Robb, 104 Mich. 242; Comstock v. Sanger, 51 Mich. 497; Studer v. Bleistein, 115 N. Y. 316.; Reed v. Randall, 29 N. Y. 358; Coploy Iron Co. v. Pope, 108 N. Y. 232; Day v. Pool, 52 N. Y. 416; Stevens v. Smith, 21 Vt. 90; Omaha Coal Co. v. Fay, 37 Neb. 68.

*Phillips & Phillips* for respondent.

(1) Respondent's mistake as to the quotation of the price of pipe, as made by appellants (if it was a mistake) was not an unreasonable mistake. A mere glance at appellants' proposal will show that they used the decimal point in a way to mislead, by using fractions in the same line with the decimal point, to-wit: By using the fraction "½" when they desired to quote less than a whole number. If the proposal as to price is misunderstood by the acceptor, and the misunderstanding is reasonable, there is no agreement as to price. Clark on Contracts, p. 302; Rupley v. Daggett, 74 Ill. 351; Mummemhoff v. Randall, 19 Ind. 44; Fullerton v. Dalton, 58 Barb. (N. Y.) 236. There being no agreement between the parties to the contract as to the price of the articles sold, respondent would only be liable to appellants for the reasonable value of the property. Arnold v. Cason, 95 Mo. App. 426. (2) The pipe was defective in a way that could not be ascertained by mere inspection, and it was not until after respondent had installed the same in its plant that the discovery of its defective condition was made. It then became evident that the pipe was not reasonably fit for the purpose for which it was manufactured and sold by appellants and purchased by respondent. (3) When a contract for the sale and future delivery of an article is made, and the article is purchased for a specific purpose known to the vendor, there is, in the absence of express limitation to the contrary, an implied warranty that its condition will be such as to make it reasonably

fit for that purpose. Lee v. Saddlery Co., 38 Mo. App. 201; Armstrong v. Johnson Tobacco Co., 40 Mo. App. 254; Brewing Assn. v. McEurve, 80 Mo. App. 429; Comings v. Leedy, 114 Mo. 454; Johnson v. Sproul, 50 Mo. App. 121. In case the vendor knows that the goods are purchased for a particular purpose, and they are found not to be fit for the purpose intended, the vendee may return them to the vendor, thereby rescinding the contract, or may keep them and defeat recovery of the purchase price to the extent of the difference between their value, if they had been of the quality contracted for, and their real value in their inferior condition. St. Louis Brew. Assn. v. McEurve, 80 Mo. App. 429; Norrison v. Leiser, 73 Mo. App. 95; Benj. on Sales, pp. 646, 649, 650; Poland v. Miller, 95 Ind. 387; Rogers v. Niles, 11 Oh. St. 48. Upon the sale of an article by the manufacturer there is an implied warranty that it will answer the purpose for which it was made. Brown v. Murphy, 31 Mass. 91; Overton v. Phelan, 2 Head (Tenn.) 445; Beers v. Williams, 18 Ill. 69; Walton v. Cody, 1 Wis. 420; Fisk v. Tank, 12 Wis. 276; Field v. Kinnear, 4 Kan. 476. (4) We concede that point 3 of appellants' brief is the law, but we contend that this law does not apply to this case, for the reason that the respondent did not know that the pipe in question was defective until it had been installed in its factory. Respondent's acceptance of the pipe at Poplar Bluff was under the belief that the pipe was reasonably fit for the purpose for which it was manufactured and sold.

LAMM, J.—Plaintiffs, doing business as partners in Chicago, Illinois, on June 20, 1902, sued defendant, a domestic corporation doing business in Butler county, Missouri, for a balance due on the sale and delivery of certain black and galvanized pipe of sundry dimensions on two dates, to-wit, March 22 and April 11, 1902.

The petition counts on the theory that the agreed selling price of the pipe was $2,232.30, and that defendant had paid thereon $1,829.13, leaving a balance due of $403.17, for which amount judgment was prayed.

At a trial in February, 1904, to the court without a jury, the issues were found against plaintiffs, they recovering nothing. On the other hand, the issues were found in favor of defendant on a counterclaim and defendant recovered a judgment of $9,046.30. From this judgment plaintiffs appeal.

Both appellants and respondent served and filed abstracts under rule 11. Further, under that rule, appellants filed objections to respondent's purported "full and complete abstract," the bone of contention being over the trial answer. A question being raised on the accuracy of said answer as abstracted, and it being contended, furthermore, that both of the abstracts by misadventure were faulty, the matter came to a head by our ordering a duly certified copy of the amended answer to be sent up and filed here as part of the record. The record being perfected in this particular, no question is now raised but what we have before us the true trial answer, filed below on June 2, 1903. Plaintiffs filed a motion below to strike out parts of the answer, which motion was sustained in part; but there is no record here giving metes and bounds to the parts of the answer stricken out. True, the court's order in the premises refers to the answer as if divided into marked and numbered sections and paragraphs. But if there were any such sections or numbers, they rested only in the mind's eye of court and counsel for purposes of their own, *nisi;* and, not being saved in the record, all identifying earmarks of excluded matter are absent and we have no light, unless we have recourse to mind-reading — a method of supplying record not recognized by the law and implying an appellate ability of doubtful existence and doubtful value. There-

fore, as the answer taken by and large stated a good defense on paper, a review of the ruling on the motion to strike out is out of the question.

Questions are made here calling for some particularity in dealing with the answer. Attending thereto, it appears defendant joined issue by a general denial, excepting therefrom specific admissions — the admissions being its incorporation and its payment to plaintiffs of the said sum of $1,829.13, which sum the answer avers was more than was due. On the theory of full payment (setting forth the facts upon which said theory proceeds) the answer alleges plaintiffs' failure to deliver 1284 feet of the pipe in suit, thus reducing the contract price by the value of such omitted pipe. Further, on such theory, it is averred that the contract of purchase made by plaintiffs and defendant was in the form of a written correspondence, consisting of a proposal asked, an offer made, followed by an acceptance; that by that contract defendant was to pay on a basis of a certain schedule or printed list price, less certain specified discounts, and the point to a line of defense pleaded is based upon the proper construction of such discounts. To sufficiently indicate this line of defense, it will be necessary to take only one item of a long account as a sample of many others. Thus: one offer was in the form of a discount from the price list of a certain kind of pipe of "48.15-5 and 2½ per cent." Defendant avers that the figures "48.15," separated by a point as indicated, mean two discounts, one following on the heels of the other, to-wit: first, one of 48 per cent, and, second, one of 15 per cent—to be then followed by one of 5 per cent, one of 2 per cent and one of ½ per cent. There is no difference between plaintiffs and defendant as to the meaning of the formula "-5 and 2½ per cent;" but they lock horns on the figures "48.15," which plaintiffs insist is one discount, ex-

pressed in integers and a decimal, meaning in trade usage the same as 48 $\frac{15}{100}$.

With this explanation it will be sufficient to say that the answer, on defendant's theory of the discounts, avers full payment of all the pipe delivered; that it accepted the offer on its theory of the discounts; that the custom of the trade was not to use the decimal system, but to use common fractions when any were called for in discounting schedule prices of pipe; and, further, that if defendant did unintentionally misconstrue plaintiffs' offer, then its defense is that plaintiffs mixed the decimal system of quoting discounts with common fractions for the very purpose of deceiving defendant, and did deceive defendant into accepting the offer. Or, if plaintiffs acted in good faith in confusingly mixing decimal and vulgar fractions in its discount, then the minds of the contracting parties never met on the price, and, on that theory, also, defendant pleaded payment of the full market price of the actually delivered pipe, even if it was sound and marketable. The answer at length then sets forth a counterclaim in the following language (stress, for appellate purposes, being somewhat laid on italicized parts):

"Defendant for further answer herein and in the nature of a set off or counter-claim to the plaintiffs' cause of action, says, that plaintiffs is a partnership doing business in the city of Chicago, State of Illinois, and that the defendant is a corporation organized under the laws of the State of Missouri, and as such is running and operating a large, extensive and expensive cooperage manufactory, at the city of Poplar Bluff, Butler county, Missouri, and, as such, receives and fills orders throughout the civilized world. Defendant further says that on or about the 12th day of December, 1901, its factory, located near the city of Poplar Bluff, was burned and totally destroyed by fire. That thereafter plaintiff [defendant] in order to resume business

at the earliest practicable moment and at a great expense, began immediately to rebuild its factory and rehabilitate itself as a cooperage manufactory, and that in order to carry on its business and operate its factory it was necessary to have different lines of pipe, made of good material and of good quality, for the purpose of conveying steam and water to various parts of its factory and to be used in operating its said factory; that its factory was nearing completion, *which plaintiffs well knew, and also well knew the purpose for which said pipe was a necessity in said factory when it made its offer in writing to the defendant to sell said pipe.* That at the time *plaintiffs agreed in writing to sell and did sell, and defendant agreed in writing to buy and did buy a certain lot of pipe of different kinds and of various sizes and dimensions as is set out in the exhibits attached to the petition, the plaintiffs well knew the purpose for which said pipe was bought, and in what capacity it was to be used in defendant's factory, and plaintiffs also knew that it required pipe of good material and good quality to answer defendant's purposes.* That the contract of the sale of the said pipe was agreed upon, by means of a certain proposition in writing, made by the plaintiffs, through the United States mail, from the city of Chicago, to the defendant at the city of Poplar Bluff, and was received by the defendant at said city of Poplar Bluff and, through the same medium, the defendant at once accepted the proposition, *relying upon* the honest and business integrity of the plaintiffs and *the truth of their assertions and representations as to the kind and quality of pipe.* Defendant further says that under the circumstances, before the pipe was delivered to it, on board the cars, at the city of Poplar Bluff, it had no means of inspecting the said pipe and, even if it had, that the defects in said pipe were latent and could not have been discovered, by an expert, in examining

said pipe. Defendant further answering says that, by the sale so made as aforesaid, *the plaintiffs warranted that said pipe was good, sound, merchantable and fit for the purposes for which it was sold and bought;* and so the defendant, relying upon said warranty of fitness, goodness and soundness, bought the said pipe from the plaintiffs and paid to them the amount set out in plaintiffs' petition as being paid, the same being the amount agreed upon between the plaintiff and the defendant, as defendant understood the price in the contract of sale. Defendant further says that, at the time of said sale, and warranty, the said pipe was not sound, *nor was it fit for the service for which the defendant intended it, but on the contrary was very defective, unsound and unfit for the service aforesaid and was wholly worthless to this defendant, and all of which the plaintiffs well knew, or could have known by reasonable diligence.* That the said pipe was constructed of the very poorest material out of which it was possible to mould said pipe, that it was very poorly and imperfectly welded, and would burst on the slightest pressure of steam and has been ever since it was first placed in position at said factory and is yet continually leaking, breaking and bursting, and by reason thereof, the defendant has from time to time been compelled to remove said pipe and replace the same with good pipe at a great expense, and *to the defendant's damage in the sum of five hundred and twenty dollars;* that the galvanized pipe included in the defendant's order was poorly galvanized and imperfectly welded and that in many instances the galvanizing on the inside of the said pipe would slough off and fill up the cavity of the pipe and thus prevent and obstruct the passage of either water or steam through said pipe. Defendant further says that by reason of the poor quality of said pipe it was continuously breaking, bursting and leaking and many times it has been compelled to shut

down its factory, and open and expose the staves contained in its dry kilns to sudden changes in temperature in order to cut out and replace the bursted and defective pipe, delivered by plaintiffs to defendant to be placed in said dry kilns, which had the effect to ruin said staves, for use, making them unmerchantable and worthless and were a total loss to this defendant; *that by this means defendant lost 9,000 34 by 3-4 whiskey staves worth $45 per thousand, and for which defendant says it was damaged in the sum of four hundred and five dollars; and that by this means 2500 45 by 1 inch export rum staves at $75 per thousand, for which defendant says it was damaged in the sum of $187; that by reason of having to open said kilns it has, in the total, lost the use of the same for fifty days, the same being worth ten dollars per day, by reason whereof, the defendant is damaged in the sum of five hundred dollars. Defendant further says by reason of the premises aforesaid, that is to say, the expense of cutting out said pipe, paying labor for the same and the other items set out above it has been damaged in the sum of five thousand dollars.*

"Defendant further answering says that, as stated in plaintiffs' petition, it has paid to the plaintiffs for said imperfect, unsound and unserviceable pipe the sum of one thousand eight hundred and twenty-nine dollars and thirteen cents, whereas in truth and in fact the said pipe was not worth more than one-third of the amount charged by the plaintiffs, and paid by the defendant, that is to say, that it was not worth more than six hundred and nine dollars and seventy-one cents, *and that defendant has been damaged thereby in the sum of twelve hundred and nineteen dollars and forty-two cents.*

"Wherefore, defendant says that by reason of the damages as above set forth in detail it has been *damaged in the aggregate sum of six thousand two hun-*

*dred and nineteen dollars and forty-two cents,* and for which it asks judgment.''

To the foregoing answer, plaintiffs replied by a general denial.

It will be seen that defendant did not content itself with pleading the substantive facts upon which it predicated damages in its counterclaim, and then laying its damages generally, but it adopted the method of particularizing the elements of its damages, laying them on each specification. For instance, the answer alleges the pipe was not sound, etc., and that it was continually leaking and bursting and, from time to time, defendant was compelled to remove said pipe and replace the same with good pipe at an expense and to the defendant's damage in the sum of $520.

Then, after specifying other defects in the pipe and renewing the charge that it burst and leaked off and on, the answer alleged that defendant was compelled thereby to shut down its factory, thus opening and exposing the staves in its dry kilns to sudden changes in temperature, which sudden variations in temperature ruined the staves being seasoned at such times and made them unmarketable and a total loss to defendant. Summarizing its damage on this score, the answer says defendant lost nine thousand whiskey staves, 34 by 3-4, to its damages in the sum of $405; and twenty-five hundred export rum staves, 45 by 1, to its damage in the sum of $187; and the use of its kiln for fifty days at ten dollars per day, to its damage in the sum of five hundred dollars. After the foregoing specifications, the answer goes on by way of arithmetical computation and summary to say that ''by reason of the premises aforesaid, that is to say, the expense of cutting out said pipe, paying labor for the same and the other items set out above, it has been damaged in the sum of five thousand dollars.''

To the foregoing is added one other element of

damages, to-wit, the pipe sold and actually delivered is alleged to be worth ''not more than $609.71.'' Deducting that sum from the total payment made to plaintiff, it says the excess was $1,219.42, and that defendant was damaged in the sum of such excess payment, making a total damage according to defendant's apparent arithmetic of the sum of $6,219.42.

A fair construction of this answer is that the sum of five thousand dollars pleaded as aggregate damages up to a certain point, is a slip in computation; and this is so, because the items of damage preceding that aggregate do not make that sum, but make the sum of $1,612. If to the latter sum be added the $1,219.42 of alleged excess payment, we have an answer that counts on a counterclaim in the amount of $2,831.42 damages, and not $6,219.42, as aggregated in its last clause.

It stands practically conceded that under the contract the pipe was to be delivered to defendant free on board cars at East St. Louis; that at defendant's request it was billed from East St. Louis over the Iron Mountain railroad to Poplar Bluff to defendant; that it was done up in bundles and that bulk was broken at East St. Louis, the pipe being shifted from Illinois Central cars to Iron Mountain cars at that point, as the result of defendant's order to rebill there. Plaintiffs' uncontradicted evidence showed all the pipe ordered was shipped; and the evidence tends to show it all arrived at East St. Louis, the contract place of delivery, and that the shortage, if any, occurred in breaking bulk there or *en route* from East St. Louis to Poplar Bluff. Defendant's proof was to the effect that a shortage was discovered in checking the pipe off at Poplar Bluff.

There is not a particle of evidence directed to the proof of the averments of defendant's answer, to the the effect that plaintiffs *knew* that defendant's cooper-

age plant had burned down, or that the pipe was intended to supply with steam heat the dry kilns of a new cooperage plant, or that plaintiffs knew that the pipe was intended for drying purposes in any cooperage plant whatever, or contracted or expressly warranted with a view to any such character of use. It was shown that defendant's order was for "black pipe" of certain dimensions and "galvanized pipe" of random lengths; and the facts upon which defendant's learned attorneys apparently rely to bring home knowledge to plaintiffs of the special use for which the pipe was intended and sold and to which it was put, is the fact that defendant's letter-heads conveyed information to plaintiffs of defendant's business as a cooperage company, and plaintiffs addressed defendant by letter as the "H. D. Williams Cooperage Company." We are also pointed to the fact that defendant's order for the pipe contained the following clause: "We would, of course, expect this pipe to be up to the standard specifications of weight and quality." There was also a suggestion in the order that defendant would need "considerably more steam pipe, probably enough for another carload," when it got further along with its plans; and plaintiffs were thanked for their best efforts to fill this order promptly and "with standard material."

It was shown that the pipe was to be paid for on delivery; and it appears that suit was brought on June 20, 1902, and that the pipe was installed in defendant's cooperage plant in the summer of that year — probably in July or August. So that, defendant had no opportunity of testing the pipe before suit brought.

Plaintiffs produced evidence tending to show that the pipe was good merchantable pipe and had been tested at its plant before shipment. Defendant intro-

204 Sup—17

duced evidence tending to show that its old plant burned down, a new one was built for which the pipe was bought and when being installed it was discovered to be unsound. For instance, a thread could not be cut on the end of the pipe without such thread sloughing off; that the pipe was of poor material, rotten, and was "butted together," instead of being welded, etc. It appears from defendant's proof that its constructing engineer became aware of the inferior quality of the pipe and that it would crush, crumble and slough off while being prepared for use and placed in position. In fact he denounced the pipe, upon information obtained while it was being put in position, as practically worthless. Nevertheless, defendant gave no notice to plaintiffs of these defects but went on and put the pipe in position and use. Defendant's evidence also established the fact that after the pipe was in position, the steam turned on and the cooperage plant commenced operation, a very low pressure of steam, sometimes even the exhaust steam, would burst the pipe here and there, and cause it to leak; and that these accidents were frequently happening. During this very time this suit was pending, and defendant was standing on a general denial alone for its defense in its first answer. It was in proof on defendant's part that the cooperage plant when such accidents occurred had to be shut down for repairs, with the result that the drying kilns cooled off to the hurt of the cooperage stuff in course of preparation for whiskey, rum and wine barrels; and that when such cooperage stuff was thus allowed suddenly to cool before being thoroughly seasoned, it produced a defect known as "hollowhorn" that ruined it for use in barrels.

On the issue relating to the discounts to be allowed, it appears that the first item of discount in every instance was plainly marked as a decimal fraction, the integers being properly separated from the fraction

by a decimal point. There was no evidence that trade usage did not allow the use of decimal, as well as vulgar, fractions in marking discounts. The evidence on plaintiffs' part was that the discounts were marked strictly in accordance with the usages of the pipe trade, and defendant's proof went no further than showing from some of its witnesses (who did not qualify themselves to speak of trade usage) that they had never seen decimal fractions and vulgar fractions employed together in a line of discount, and that defendant's officers were misled by the use of both kinds of fractions. As to evidence tending to show that method was employed by plaintiffs to deceive or confuse, there was none.

Defendant's evidence further tended to show that if its theory of the discounts and its theory of a shortage and plaintiffs' liability therefor were adopted, it had made full payment of all pipe delivered.

When it came to proving its consequential damages, defendant, not confining itself to the limits of its answer, was allowed a wide and unregulated range. For instance, it introduced evidence tending to show it suffered damage in the amount of six hundred and fifty dollars by shutting down kilns, shutting off steam and taking out six hundred and fifty pieces and rethreading six hundred and fifty feet of new pipe (the nearest approach to this item in the answer is five hundred and twenty dollars); and damage in the amount of two thousand and six hundred dollars for two hundred and sixty days at ten dollars per day in loss of use of kilns, and eighty dollars for the loss of use of other kilns (the nearest approach to both these items in the answer is the allegation of fifty days' loss at ten dollars per day, to-wit, five hundred dollars). The rum staves lost were shown to be eighteen thousand, one hundred, valued at one thousand, eight hundred and ten dollars (in the answer the number of rum staves was placed at two

thousand, five hundred and the damage at one hundred and eighty-seven dollars). In the evidence a loss of seven thousand "whiskey headings" was shown to defendant's damage in four hundred and twenty dollars (no such allegation was in the answer). In the evidence one thousand "rum headings" were shown to be lost to defendant's damage in the amount of one hundred dollars (no such allegation was in the answer). By the evidence a loss of nine thousand whiskey staves were shown to defendant's damage in the amount of five hundred and forty dollars (the damage alleged on this item in the answer was four hundred and five dollars). By the evidence there was a loss of fifteen thousand wine staves shown to defendant's damage in the amount of nine hundred dollars (no such item in the answer). And so on.

Plaintiffs made no objection to the introduction of the foregoing testimony and offered no countervailing proof—their counsel announcing to the court, in effect, that his clients stood upon their non-liability in law for any damages of that character.

Plaintiffs, having asked, were refused the following declarations of law (among others), saving their exceptions at the time:

"The court, sitting as a jury, declares as the law of this case, that upon the pleadings and the evidence defendant is not entitled to recover, of and from the plaintiffs, any damage for labor, or for any injury to its staves or heading, or for any loss of the use of its dry kilns.

"The court, sitting as a jury, declares as the law of this case, that although the court should find from the evidence that the wrought iron pipe purchased from the plaintiffs was not suitable for the use and purpose for which it was used by the defendant, yet if the court should further find that plaintiffs were not advised and notified of the purpose for which defendant desired to

use said pipe, and that at the time that said pipe was sold to the defendant plaintiffs did not know that said pipe was to be used in defendant's dry kilns, for the purpose of drying of staves and heading; defendant cannot recover of and from the plaintiffs for any damage sustained by reason of any injury to said staves or heading, or for any loss of the use of said kilns.''

In the motion for a new trial, error was alleged in refusing the foregoing instructions; and the motion in arrest was based upon the ground (among others) that ''upon the record said judgment is erroneous.'' Timely exceptions were saved to the ruling on each of these motions. On this record, was the case well tried? Manifestly not. Because:

I. Defendant's counterclaim was in the nature of a cross-petition, and, as such, amenable to accepted rules relating to stating a cause of action. The object of all pleading is to develop the real issue, in as short, nervous and perspicuous a way as may be. At common law, ''good pleading consists in good matter pleaded in good form, in apt time, and due order.'' [Co. Litt. 303.] Facts should be stated logically, in their natural order, with certainty, that is, clearly and distinctly, to the end that the party who is to answer may readily understand what is meant in order to prepare his defense. Pleadings are no longer to be put in (in any court of this State) by counsel, *ore tenus,* or *vive voce,* as at Athens, or as at the very old common law. [2 Bl. 293.] Our Code of Civil Procedure contemplates they shall be in writing and signed by counsel. That code contemplates further that a cause of action should be stated in a plain and concise way, consisting of facts constituting it, that no allegation should be made which the law does not require to be proved and that only substantive facts should be stated. The converse of these propositions follows and obtains inevitably, that is, that material facts not in writing shall not be proved

at the trial, that proof and allegation must correspond and that no recovery be had on a new or a different cause of action than that chalked out in the written pleadings. Of what avail, withal, is the whole body of the commandments of the law relating to pleadings, and of what avail is the wisdom of orderly trials in obedience to that law, as settled by line upon line and precept upon precept, if the pleadings are to be finally cast to the wind, at the very moment of their use, to-wit, at the trial—if the plaintiff, on one hand, may predicate a recovery on matter outside his petition, or if defendant, on the other hand, may recover a judgment on matter beyond his counterclaims?

To cite authority to sustain a self-evident proposition like the foregoing, is but to confuse or throw doubt upon it; and, therefore, none is necessary.

If defendant had seen fit to amend its answer before, during or after trial in accordance with our liberal statutory provisions, or if plaintiffs had seen fit to adopt defendant's new issues as within the answer, had offered countervailing proof on such extraneous issues, and joined in submitting them to the court sitting as a jury, the question might take on another form on appeal; but on an answer which (fairly construed) demands judgment for $2,831.42, or which (taken in its dry letter without reference to items of damage) demands judgment in an aggregate of $6,219.42, to allow a recovery of $9,046.30 is to make a gazing-stock of the law and establish a precedent which, if followed, would overthrow not only the logic but the common sense of the science of pleading.

On this record, the judgment was erroneous and it was reversible error to overrule the motion in arrest.

II. As the cause must be reversed and remanded for a new trial, other questions made here will be determined. For instance, on this record, was defend-

ant entitled to recover for the consequential damages claimed in its answer?

It will be observed the answer alleges plaintiffs well knew the following things, viz, that defendant's cooperage factory had burned down, that a new one was nearing completion, that the pipe ordered was necessary in said factory, and knew the use to which the pipe was to be put in drying cooperage stuff. The answer, then, in effect, charges that, so knowing all the foregoing things, plaintiffs undertook to and did sell such pipe to defendant as would be fit for such particular use, and that defendant bought the pipe under a warranty to that effect and installed it relying on the contract and in ignorance of its faults. The legal effect of this part of the answer, in final analysis, may be summed up to be a charge that defendant employed plaintiffs to exercise their judgment in selecting and furnishing to it pipe fit for use in the drying kilns of a cooperage factory, and should be mulcted in consequential damages for failing to perform their duty in that behalf. The pleading is well enough in this behalf but, when it came to the proof, not one of the foregoing allegations was made good. Defendant's letterheads, however blandly read, were not pregnant with proof of such allegations, as argued by learned counsel. The fact that the order recited that defendant would expect the pipe to be up to the standard specifications of weight and quality does not supply such proof, as further argued; and the same may be said of that conjectural clause in defendant's order referring to the fact that it would in the future need considerably more steam pipe. None of these things can be broadened into evidence tending to bring the alleged knowledge home to plaintiffs. Nay, more, if it was intended to bring such knowledge home to plaintiffs by the self-serving and self-laudatory allegation in the answer that defendant runs "a large, extensive and expensive

cooperage manufactory, at the city of Poplar Bluff, Butler county, Missouri, and as such receives and fills orders throughout the civilized world,'' yet there was no proof offered of such world-wide course of dealing in the component parts of whisky, rum and wine barrels as would, as a matter of current history, fasten notice on plaintiffs, they being iron men in Chicago and engaged in quite another line of trade. There was no proof that plaintiffs knew of the existence of defendant corporation prior to the order; and the uncontradicted and positive testimony was that plaintiffs knew nothing of the particular use to which the pipe was to be put.

Absent this proof, and absent any agreement (as here) expressly warranting the pipe to be fit for the particular use to which it was put, the question is whether the plaintiffs are liable for the consequential damages sued for? Under the terms of the contract as spelled out in the correspondence, there was obviously (as said) no express warranty, and that phase of the matter may be accordingly put aside. The remaining question is: Was there an *implied* warranty?

We will not encumber this opinion by extended quotations from the many cases and text-writers industriously collated and cited by counsel; but the applicable rule of law is aptly formulated by Mr. Chief Justice FULLER in Seitz v. Brewers' Refrig. Co., 141 U. S. 510, and it will not be amiss to quote and adopt what is there said on page 518, *et seq.*, thus: ''The rule invoked is, that where a manufacturer contracts to supply an article which he manufactures, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment of the manufacturer, the law implies a promise or undertaking on his part that the article so manufactured and sold by him for a specific purpose, and to be used in a particular way, is reasonably fit and proper for the purpose for which he professes to make it, and for which it is known to be re-

quired; but it is also the rule, as expressed in the text-books and sustained by authority, that where a known, described and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer."

It will be seen that to hold a seller liable for consequential damages for a failure of an article to fit a specific purpose (which is the case at bar) the first rule announced above proceeds on the assumption that the seller had knowledge of such specific intended use and contracted to supply that identical use. Mr. Benjamin in his profoundly scholarly work on Sales (Benj. on Sales (5 Eng. Ed.), p. 624), states the rule the same way, thus: "Fourthly—Where a manufacturer or a dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an implied term or warranty that it shall be reasonably fit for the purpose to which it is to be applied. In such a case the buyer trusts to the manufacturer or dealer, and relies upon his judgment, and not upon his own."

The rule relating to damages for the breach of a contract of warranty generally approved, is found in the leading case of Hadley v. Baxendale, 9 Ex. 341, 26 Eng. L. & Eq. 398. In that case Baron ALDERSON said: "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed

to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it.''

It will be seen, then, that damages may be recovered of two classes: first, such as arise naturally, according to the usual course of things, from the breach of the contract; and secondly, such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of a breach. Damages of the latter class are termed consequential.

Under the first class, where the buyer retains the article, damages may be recovered for the difference between the actual value of the article at the time of the sale and what its value would have been if it had been as warranted (30 Am. and Eng. Ency. Law (2 Ed.), 209, such values to be determined by the market at the place of delivery, and if there is no market there then at the nearest market; and of course in given circumstances, where the article is entirely worthless and the price has already been paid, the buyer may recover the price back.

Under the second class, to-wit, consequential damages, all damages reasonably within the contemplation of the parties may be recovered. Under this head, if I contract to supply pipe to my neighbor to be applied to a known and particular use, under such circumstances that my neighbor trusts to my judgment, and not to his own, that the pipe will serve the known and specified purpose, then a promise or undertaking is implied on my part that the pipe is reasonably fit for the particular purpose. If, therefore, I sell pipe to my neighbor under an implied warranty that it is fit for use to supply steam heat for drying kilns in a cooperage plant and my neighbor relying on the warranty and knowing nothing of the unfitness of the pipe, i. e., without negli-

gence on his part, applies it to such use and damages result to his staves, cooperage stuff and otherwise from such use, I am liable for such consequential damages because they were fairly within the contemplation of my neighbor and myself when the contract was made.

Now, the case at bar does not come within the last hypothesis in any particular. Here plaintiffs knew nothing of the particular use to which the pipe was to be applied, hence did not contract with a view to that use, and, hence, there was no implied warranty. Not only so, but under the facts of this record, supplied by defendant, the weakness, rottenness and other defects in the pipe became fully known to it, through its superintendent, while the pipe was under manipulation in being installed and before a pound of steam was turned on. Use of unfit pipe, after knowledge of unfitness, comes within the maxim, *volenti non fit injuria*. A running account of damages accruing through a year or so of such use, as here, is looked on with an averted face by the law. A buyer of pipe may not breed and multiply actionable damages against the seller in that way.

We conclude that the instructions hereinbefore set forth were the law of the case. By not giving them and by allowing consequential damages, it becomes clear the trial court tried the case on a radically erroneous theory, and the judgment should be reversed on that account also.

III. The pipe was to be delivered at East St. Louis—not at Poplar Bluff. The evidence is that the entire invoice was shipped and arrived at East St. Louis, and, moreover, is that if any shortage occurred it was after the reshipment at that point; and, hence, under elementary law, the loss must fall upon defendant.

IV. Nor is there any meritorious defense in defendant's contention based on a mixture of common

and decimal fractions in the discounts. One thing is certain, and that is, both kinds of fractions were plainly used and set down in writing. The proof shows that under trade usage discounts are expressed by using indifferently both kinds of fractions; and defendant, in the absence of fraud or deceit, as here, may not predicate a defense upon its failure to recognize, or comprehend the office of, a decimal point and a decimal fraction when it sees one.

V. But we cannot agree with plaintiffs' contention that on this record a judgment should be entered in their favor as a matter of law. The pipe was ordered as of standard quality. It was sold and delivered as pipe of standard quality at the market price—a sound price. If it was below standard quality, or worthless, then defendant was entitled to damage in the difference, if any, at the place of delivery, between the market value of the pipe actually delivered and the value it would have had if up to standard quality. So far damages may go, and that question has never been fairly tried. It should be submitted to a court or jury on proper issues and on proper instructions.

The judgment is reversed and the cause remanded to permit that question to be tried out in accordance with this opinion.

All concur.