LONDON GUARANTEE & ACCIDENT COMPANY, LIMITED, Appellant, v. STRAIT SCALE COMPANY.—15 S. W. (2d) 766.

Division One, March 29, 1929.

504

*Battle McCardle* and *Langworthy, Spencer & Terrell* for appellant.

*Morrison, Nugent, Wylder & Berger* and *Howard L. Hassler* for respondent.

RAGLAND, J.—This is a suit to recover damages growing out of the breach of an alleged implied warranty. In the early part of 1916, the Roberts & Schaeffer Company of Chicago, Illinois, hereinafter called the Construction Company, built for the Chicago & Great Western Railroad Company, hereinafter referred to as the Railroad Company, at Hayfield, Minnesota, a locomotive coaling station. It was built under a contract by which the Construction Company furnished all of the labor and material. As a part of the equipment a set of suspension scales was installed: the scales were purchased by the Construction Company from the defendant. After the structure had been completed and before delivery to the Railroad Company and while the machinery and appliances for hoisting and weighing coal were being tested by representatives of the Construction Company and operatives of the Railroad Company, one of the principal beams which supported the scales, owing to a latent structural defect, broke, causing the scales and a considerable portion of the structure to suddenly fall to the ground. One of the Railroad Company's employees was killed and another seriously injured. Thereafter the injured employee and the personal representative of the one deceased recovered against the Construction Company in a district court of the United States, in Minnesota, judgments aggregating $13,740.55. Defendant was duly notified of the institution and pendency of the actions which culminated in these judgments and was given an opportunity to appear therein and defend, but declined to avail itself of such opportunity.

Prior to the accident just referred to plaintiff had issued to the Construction Company a policy of insurance, whereby it had agreed to indemnify the Construction Company for loss from the liability imposed by law for damages on account of bodily injuries, including death, suffered by any person or persons not in its employ. In accordance with the terms of its policy, plaintiff defended the actions against the Construction Company, incurring in so doing an expense of $1248.97, and thereafter paid the judgments recovered therein.

The contract of insurance contained a clause providing: "In case of payment of loss or expense under this policy the Company shall be subrogated to the amount of such payment to all rights of the assured against any person, firm or corporation as respects such loss or expense. . . ."

The warranty asserted, and alleged to have been breached, is disclosed by the following excerpt from the petition:

"That the said scales so as aforesaid delivered by the defendant under said contract to said Roberts & Schaeffer Company was not according to the terms of aforesaid order or the warranty therein, said scales were not of suitable material and quality and were not manufactured with reasonable skill and correctness, or in workmanlike manner, and were not reasonably fit for the purpose contemplated in and by said contract and the warranty therein when used in the customary manner, that said lever-pipe or rocker-beam of said scales of a weight of about 300 pounds and of cast iron was imperfectly, defectively and carelessly moulded and cast and was of insufficient and imperfect thickness at certain places and too thin and weak at certain places to bear the strain and weight which it was designed by said contract and warranty therein to bear, and by reason thereof said scale was unsuitable and not reasonably fit for the purpose aforesaid, and that at the time of acceptance of aforesaid order and at all times thereafter the defendant knew well that when said lever-pipe or rocker-beam was placed in position in said coaling station and subjected to a load of approximately 130,000 pounds there would be great danger in case it should break that thereby there would be caused great injury or death to persons working in and about said coaling station."

The damages assigned upon the breach of such warranty, and for which a recovery is sought, are the sums paid out by plaintiff in defending the suits and satisfying the judgments heretofore referred to.

At the close of plaintiff's case in chief a peremptory instruction in the nature of a demurrer to the evidence was given at the instance of defendant, and a verdict in accordance therewith was returned by the jury. On this appeal the sufficiency of the petition is not questioned: the sole matter for determination is whether plaintiff on its evidence made a case for the jury. Such determination involves two principal questions: Was there an implied warranty as alleged? and if so, did its breach directly and proximately cause the damages for which a recovery is sought?

I.  The question of implied warranty calls for an additional statement of facts.

The Construction Company was a contractor, engaged in building railroad coaling stations. Its contract with the Railroad Company called for the erection of one "fifty-ton capacity, frame constructed, one-track, steam driven, Standard counterbalanced, bucket locomotive coaling plant—. . . equipped with Strait Scales having a capacity for recording coal to engines from

the fifty-ton scale pocket.'' The station erected pursuant to the contract consisted of a superstructure about one hundred feet in height, and an operating or engine house on the ground directly beneath the superstructure, for the use of those operating the station and its machinery and scales. The scale was located in, and permanently attached to, the superstructure about seventy feet from the ground and sixty feet above the roof of the operating house. From the scale was suspended a coal hopper of fifty-ton capacity, the lowest point of which was about thirty feet above the operating house: the hopper was a part of the scale. The plant was designed to be used in this manner: coal would be discharged from railroad cars into a chute and then elevated to the top of the superstructure by an automatic feeder; it would then be dumped into the scale hopper and from thence released to the locomotives as required; a recording device in the operating house would register the exact intake and output of the scale hopper.

Defendant was engaged in the manufacture and sale of scales for weighing coal at railroad coaling stations: its managing executives were entirely familiar with the type of coaling station above described, having theretofore furnished suspension scales for similiar plants erected by the Construction Company. With respect to the one in question, its sales agent was given the requisite data by the Construction Company to enable it to design a suitable scale; thereafter it submitted to the Construction Company a blue print of such a scale, designated by it, ''S. 886;'' and thereupon the Construction Company gave them an order for:

''I. Set Strait Scales, of 50 tons weighing capacity, plus weight of wood hopper and fixtures attached. Total approximate load 130,000# Scale to be of four lever type per your Company's print S. 886 revised complete with four 1-3/4'' hangar rods upset to 2'' and of necessary lengths. Beam box and necessary rods, levers, etc. to locate box where called for on mentioned drawings.''

In due time after receipt of the order defendant shipped from Kansas City, Missouri, to the Construction Company at Hayfield, Minnesota, a set of scales which purported to conform to the order, and which was thereafter installed in the plant as already indicated.

The scale furnished by defendant was known as the four-lever type: there was a lever at each corner of its frame: in addition to these there was a long transverse lever, referred to by the witnesses as the ''lever beam'' or ''rocker beam.'' This beam was a cast-iron pipe weighing approximately 300 pounds: it was designed to carry one-eighth of the load—scales and hopper filled to capacity with coal, 130,000 pounds: it was the one that snapped in two at the time the hopper was being filled for the first time. If the walls had been uniformly three-fourths of an inch thick, as designed by the manu-

facturer, it would have supported 15,000 or 16,000 pounds; but it was defectively moulded, the wall on one side at the point at which the break occurred being only three-sixteenths of an inch thick. Because of such defect it would not carry a weight exceeding 12,000 pounds.

When the scales were received by the Construction Company at Hayfield, its superintendent inspected the parts for the purpose of ascertaining whether any of them had been damaged, broken or cracked in transportation. This was termed an ordinary inspection. Such an inspection would not, and did not, disclose the latent structural defect in the lever pipe. This defect was discoverable only by an expert—through a test known as the hammer test. The Construction Company had no such inspection made.

From each of the four corners of the scale frame a heavy chain dropped down and was attached to the scale hopper. These chains had two inches of slack, that is, if the lever beam broke, the hopper would fall two inches before its weight would come upon the chains. According to the Construction Company's superintendent of construction, these chains were not designed to carry the weight of the loaded coal pocket in the event the lever beam gave way; they were intended merely to keep the scale pocket in place and from sagging at the corner if a corner lever broke, and to raise and lower the empty pocket when repairs were necessary. These chains were not furnished by defendant: they were bought and put on by the Construction Company in conformity with its own practice in that respect. One of the witnesses referred to the chains as "safety chains." From this the inference is sought to be drawn that the Construction Company did not rely on the sufficiency of the lever beam to support the load at all events, but put these chain devices on to insure safety in that respect. Such an inference might be drawn, but a jury would be warranted in finding that the chains were intended only for the purposes indicated by the Construction Company's superintendent. What happened to the chains when the beam broke is not clear from the record: they did not, however, impede in any degree the fall of the coal-laden hopper.

The circumstances under which the law will imply a warranty as an incident of a contract of sale have been fairly well settled. For a summarization of them, as applicable to the facts of this case, we quote the language of the Supreme Court in Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 116:

"When the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manu-

facturer or maker by his occupation holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use.''

The converse of the rule deducible from the foregoing is found in Seitz v. Brewers Refrig. Co., 141 U. S. 510, 518:

''But it is also the rule, as expressed in the text-books and sustained by authority, that where a known, described and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer.'' [See, also, Mark v. Cooperage Co., 204 Mo. 242, 103 S. W. 20; Lindsborg, etc., Co. v. Danzero, 189 Mo. App. 154, 174 S. W. 459.]

In purchasing such an article the buyer, if unwilling to trust his own judgment, must exact an express warranty; otherwise, the maxim of *caveat emptor* applies.

The contract between the Construction Company and the Railroad Company called for a ''Strait Scale,'' as a part of the equipment of the coaling station. From this it would seem that the scale required was a ''known, described and definite article.'' But if that had been so, the Construction Company would have ordered it without consulting the defendant's sales agent, except possibly as to price. On the contrary the Construction Company submitted ''data,'' and with this information in hand the defendant made a blue print or drawing of the scale which it affirmed, impliedly at least, would serve the purposes intended. And such scale the Construction Company ordered. Whether the defendant manufactured a scale especially to fill the Construction Company's order, or whether it selected for that purpose one from the different types which it had theretofore manufactured, does not appear. But in any event, it knew to the minutest detail the purposes for which the scale was intended, including the character of the structure in which it was to be installed and the manner of such installation; it knew the injuries to persons and property that would likely ensue if, through

latent defects, the supporting levers gave way, causing the scale and hopper to fall: it had every reason to believe that the Construction Company would rely, as that Company did, on its furnishing a scale free from such defects—it could not have assumed, all the circumstances considered, that the Construction Company would employ an expert to test every casting and bearing for the purpose of ascertaining whether there were any hidden defects. The facts stated, if true, gave rise to an implied warranty on the part of defendant that the lever beam was suitable and fit for the purpose for which it was designed.

II. 1. The point is made by respondent, though not pressed with any vigor, that the damages sought to be recovered are too remote. But from the facts already stated it is plain that both defendant and the Construction Company knew the uses to which the lever beam was to be put, the stress and strain to which it would be subjected; that if it broke, owing to a hidden structural defect, the scale and hopper would fall upon the engine or operating house of the coaling station; that injury to persons and property would thereby likely ensue; and that under the law the Construction Company would be required to respond in damages therefor. Such consequential damages, it may therefore reasonably be supposed, were in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. It follows that they are recoverable. [Marks v. Cooperage Co., supra, l. c. 266; Busch & Latta Painting Co. v. Woermann Const. Co., 310 Mo. 419, 276 S. W. 614.]

2. It is next urged that, with respect to the negligence which caused the injury to one, and the death of another, of the Railroad Company's employees, the Construction Company and the defendant were *in pari delicto*—joint tortfeasors—and for that reason the Construction Company's subrogee, the plaintiff herein, cannot recover in this action. The record does not disclose the ground or grounds upon which a recovery was had against the Construction Company for the injury and the death just referred to: neither the pleadings nor the instructions given the jury in the case in which such recovery was effected were offered in evidence. But it is manifest from other facts in proof that the ground of liability was the negligent failure of the Construction Company to have had made an inspection that would have disclosed the insufficiency of the lever beam to support the weight that was to be put upon it. While it did not owe to defendant the duty to have such inspection made, it did owe it to its own employees and to those of the Railroad Company who under the contract were to assist in testing the scale and machinery before de-

livery of the station to the Railroad. However, the negligence of the Construction Company was wholly independent of that of the defendant—both in point of fact and in point of time. It is very doubtful therefore whether they were joint tortfeasors in any proper sense. The question of whether they were or not, it seems to us, is without relevance. This is an action for damages growing out of a breach of contract and not for contribution in tort. The real question is whether the damages sued for were proximately caused by defendant's breach of contract, or by the Construction Company's subsequent tort. And that question is not to be solved according to abstract principles of the law of negligence relating to proximate cause, but from the standpoint of contract—this is a suit for breach of contract. The question of proximate cause, so far as pertinent here, is but a phase of the broader question of remoteness of damages. If the contract had in express terms provided: "The defendant warrants that the lever beam is structurally sound and fit for the purposes for which it is intended, and it is mutually understood by the parties that the Construction Company will rely on such warranty and not make an inspection or test of its own," it would be perfectly obvious that the liability for damages to third persons imposed by law upon the Construction Company for its failure to inspect would *within the contemplation of the contract* have been proximately caused by the breach of the warranty. The warranty would have been analogous to a contract of insurance: its legal effect would not have been different had it been implied instead of being expressed. And such in all essential respects is the warranty in this case. The Construction Company's failure to inspect, through which it incurred liability for the injuries received by the workmen who were required to be in the engine-house during the testing period, was presumptively induced by its reliance on the defendant's representations that the lever beam was sound and sufficient for the uses to which it was to be put.

The reasoning employed and the conclusions reached with respect to the question of remoteness of the damages find support in a number of well-considered cases: Mowbray v. Merryweather, 2 Q. B. 640 (1895), is the leading English case; the leading case in this Country is Woven Hose & Rubber Co. v. Kendall, 178 Mass. 232; other cases are: Otis Elevator Co. v. Cameron, 205 S. W. (Tex.) 852; Mallory S. S. Co. v. Druhan, 84 So. (Ala.) 874; Alaska S. S. Co. v. Pacific Coast Gypsum Co., 71 Wash. 359; Dayton Power & Light Co. v. Westinghouse Elec. & Mfg. Co., 287 Fed. 439.

III. "It is well settled that where a person is responsible over to another, either by operation of law or express contract, and he is duly notified of the pendency of the suit against the person to whom

**514**

he is liable over and full opportunity is afforded him to defend the action, the judgment, if obtained without fraud or collusion, will be conclusive against him, whether he appeared or not.'' [15 R. C. L. 1017.] It is manifest, therefore, that the judgment of the United States District Court conclusively determines for the purposes of this action that the Construction Company was legally liable for the damages suffered by the Railroad Company's employees through the breaking of the lever beam, and the amount of that liability. [Grant v. Maslen, 151 Mich. 466; Lord & Taylor, Inc., v. Yale & Towne Mfg. Co., 230 N. Y. 132; Ocean Steam Navigation Company v. Compania Transatlantica Espanola, 134 N. Y. 461; Dayton Power & Light Co. v. Westinghouse Elec. & Mfg. Co., supra.]

It seems to be conceded that plaintiff has the right to bring and maintain this action in its own name, as subrogee, if maintainable by the Construction Company.

For the reasons indicated in the foregoing, we are of the opinion that plaintiff's evidence made a case for the jury. The judgment of the trial court is accordingly reversed, and the cause remanded. All concur.