**INTERSTATE FOLDING BOX COMPANY,**
a Corporation (Plaintiff), Respondent,

v.

**HODGE CHILE COMPANY, a Corporation**
(Defendant), Appellant.

No. 30314.

St. Louis Court of Appeals.
Missouri.

April 19, 1960.

Rehearing Denied May 16, 1960.

Robert Mass, Mellitz & Frank, St. Louis, for appellant.

Lewis, Rice, Tucker, Allen & Chubb, John Torrey Berger, J. L. Pierson, St. Louis, for respondent.

RUDDY, Judge.

Plaintiff in this action seeks payment of an unpaid balance due it for certain frozen

food cartons manufactured and shipped to defendant pursuant to an order placed with plaintiff by defendant. Defendant in its answer and counter-claim alleges the breach of an implied warranty of fitness for use and failure of plaintiff to ship cartons that were "up to the plaintiff's sample specifications that had been tested" by defendant. In a trial without a jury the Circuit Court of the City of St. Louis found in favor of plaintiff on its petition and against defendant on its counter-claim and defendant appeals from the trial court's judgment.

Plaintiff's evidence tended to show the following facts: Joseph A. Louvier, a salesman for plaintiff, in the course of his duties had sold defendant various types of cartons prior to February 1953. In February of 1953 Vern A. Hodge, President of defendant, Hodge Chile Company, talked to Louvier "about packaging frozen chile." Louvier informed plaintiff of the request and what the cartons were to be used for. Louvier then supplied defendant with samples of "Frostofold" cartons for the purpose of having defendant test the samples to "see if they worked satisfactorily."

Thereafter, Louvier regularly contacted Hodge and others employed by defendant, and they kept him informed about the progress of the tests they were making with the sample cartons. Louvier was present when some of the cartons were filled with chile and when some of them were opened after the contents had been frozen. All of the test samples he saw were satisfactory and the cartons showed no leaks. The tests were conducted by defendant from February until December of 1953. The method defendant used to test the sample cartons, as described by Louvier, was to take the "chile out of the vats with a dipper." After filling the carton it would be "heat-sealed" and then placed in a refrigerator for cooling. Later, the filled cartons were taken to an employee's home and placed in a freezer. The tests were conducted by defendant in the late morning, after the defendant's production schedule was completed. According to Louvier, when the sample cartons were being filled the chile was not "too hot" and was not steaming. He was certain the temperature of the chile was not as high as 180°. He said the heat was not turned on under the vats at the time the cartons were filled.

In December 1953, Vern Hodge told Louvier that the tests were completed and the cartons were satisfactory for defendant's purpose and product. Defendant then executed the following order:

"December 21, 1953
"Interstate Folding Box Co.
"Middletown, Ohio.
"Gentlemen:

"Please Enter our order for the following:

"100,000, six panel reverse tuck cartons with a Thermofoil B inner liner, 4½ x 3⅞ x 1⅜, made from .022 Sterilstate board and printed two colors, $31.30 per thousand. Delivery allowed to St. Louis.

"Plates for the above to be charged in addition.

"90 days storage to be provided at completion of order and one fourth to be shipped when order is completed.
"Very truly yours,
"Hodge Chile Company
(S) V. A. Hodge."

Present on the occasion when the above order was given were Vern A. Hodge and William Meentemeyer, Assistant Secretary and Bookkeeper of the Hodge Chile Company. The order was dictated by Louvier to Meentemeyer who prepared the typewritten order. It was necessary for Louvier to dictate the specifications of the cartons because of his familiarity with them. Louvier said the specifications in the order were taken off of a "Frostofold" carton he had with him at the time and that the specifications stated in the order described the specifications of the "Frostofold" cartons submitted as samples for the tests. The only difference in the description was

the size of the carton. Defendant wanted a carton of a different size than those submitted for the tests. Louvier testified that other "than the size of the box" the language in the order, was an accurate description of the "Frostofold" cartons submitted for the tests. When the carton was manufactured as ordered it was not usable by any of plaintiff's other customers.

On January 13, 1954, an "Acknowledgment of Order" was mailed to defendant. The only part of the Acknowledgment that might be claimed to be a modification or qualification of defendant's order, reads as follows:

"8. * * * Suitability of any of the merchandise covered by this order for any particular use by buyer is solely the buyer's responsibility, and is conclusively presumed to have been heretofore favorably determined by the buyer on tests, whether actually so determined or not. It is understood that all of the merchandise covered by this order is sold without warranties of any kind from seller unless specifically set forth in writing by an officer of seller."

Defendant denied receiving this acknowledgment. John W. Wilson, Comptroller and Office Manager for plaintiff, testified to the procedure and practice of plaintiff company in connection with the acknowledgment of orders and the mailing of same. He said the acknowledgment "was most certainly mailed" to the defendant and was never returned to plaintiff by the United States Post Office Department.

After the art work to be placed on the cartons was approved by defendant, some of the cartons were processed and manufactured by plaintiff and approximately 25,000 (one-fourth of the number ordered) were shipped by plaintiff and delivered to defendant. Defendant paid for these cartons, together with the cost of the original engraving plates, pursuant to the terms of the order. About five months later the balance of the cartons ordered was shipped to defendant and it refused to receive them.

Louvier testified that the cartons ordered and shipped were the same, except for size, as those given defendant for test purposes.

A few months after the first shipment and some time before the last shipment, Louvier heard that the cartons were leaking. He then went to defendant's plant to see if he could help solve defendant's difficulties with the cartons, but he stated he was not entirely successful. Louvier was present at one of the production runs when the cartons were filled with chile. When he was asked what difference he observed between the way the cartons were filled on the production run and the way the test cartons were filled, he stated: "Well, it was filled on the production run directly out of the vat, through an automatic filler of some sort and, of course, the product was much hotter, and had to be to go through the filler." He further stated that thereafter the cartons were sealed and were immediately placed in a corrugated case which was then sealed. He said the cartons were packed closer together than they were on the tests.

On cross-examination Louvier testified that the chile "was hotter" when the production cartons were filled than it was when the test cartons were filled, adding that Vern Hodge told him the chile had to be 180° to go through the filling machine. He said the production cartons leaked because "they were handled differently" than the test cartons. He based this on his observation of the different methods used in the filling and packing of the respective cartons. When the sample cartons were tested they were filled by "hand dipping" the chile out of the vats. On the production runs the cartons were filled by a machine which would not operate if the chile was too cool, because chile then gets heavy and thick.

After Louvier learned of defendant's difficulties with the cartons, he notified the home office of plaintiff. Robert W. Nerenberg, a chemist employed by plaintiff, was sent to the plant of defendant. Neren-

berg made a number of tests. In one of the tests he put water in the cartons at a temperature of 130° to 140° and at that temperature they did not leak. When water of a higher temperature was put in the cartons, they leaked. Various other tests were made. When the cartons were filled with chile at high temperatures they leaked. When filled at lower temperatures they did not leak. In some instances if the cartons were frozen slowly they would leak, if frozen quickly they would not leak. Nerenberg denied that he said "somebody goofed" at the factory and said that the description of the cartons ordered by defendant was the same as that of the sample "Frostofold" carton tested by defendant. He further said that he ran a test at plaintiff's factory to determine whether the materials used in the carton supplied pursuant to the order were of the same quality as in the cartons supplied defendant for testing. He said the cartons shipped conformed to the specifications of the "Frostofold" cartons supplied for testing purposes. When asked to account for the leaking of the cartons shipped pursuant to order, whereas the test cartons did not leak, he said: "It is a matter of the way in which they were packed and had to be handled. It is accepted practice in the frozen food field to freeze the package individually so you get the quickest freezing package you can; that's the whole theory of quick freezing food as opposed to refrigeration. When they tested these packages, they must have cooled them down rather rapidly where they were separated and very good circulation of air can get around them. When I went down to the Hodge Chile Company, they were in a case of twelve, which would take quite a while to cool down, it would take overnight to freeze, in which time grease would leak out. If they were frozen quickly, it would not."

Samples of the Hodge Chile Company carton shipped under the order and of the carton marked "Frostofold" were sent by plaintiff to the United States Testing Company, Inc., at Hoboken, New Jersey. Both sets of samples were tested by that company. The depositions of two of its employees were introduced into evidence by plaintiff. These witnesses had tested the respective samples and found no significant difference in the basis weight of the paper and foil used in the two sets of samples and found that the Hodge Chile Company carton showed a greater basis weight of polyethylene than the "Frostofold" sample. They said this greater thickness of polyethylene made then more resistant to grease and water. Nerenberg said the "Frostofold" samples sent to the United States Testing Company, Inc., were made to the same specifications as the test samples used by defendant. He said both sets of samples could have been from the same stock, but he could not be sure.

Plaintiff offered to make 100,000 new cartons with new liners. Defendant agreed to the proposition, provided plaintiff would give a credit for what it paid on the initial 25,000 cartons previously delivered. Plaintiff refused to do this.

Defendant's evidence tended to show the following facts: In the early part of 1953 Louvier approached Vern A. Hodge with the suggestion that defendant market frozen chile. Hodge told Louvier that he was interested, providing plaintiff could furnish a carton that would hold chile. Louvier presented defendant with some "Frostofold" cartons "to experiment with and run tests with."

The manner of conducting these tests was described by Hodge, Meentemeyer and Yates. The latter was a machine operator and production man for the defendant. A number of tests were run extending from February of 1953 until December of the same year. The witnesses estimated 75 to 80 tests were made in that period. All of defendant's witnesses said the chile was extremely hot when put in the "Frostofold" cartons, estimating the temperatures from 190° to 200°. Hodge said, "I wanted to give it the acid test so I would know I had a package that would hold my product." On the test runs the chile was dipped by

hand from the cooking vats and put in the cartons. After the cartons were filled and sealed they were placed in a cooler at defendant's plant. They were left in this cooler until Yates went home the evening of the test at which time he would take the filled cartons out of the cooler and place them in a deep freeze box he had at his home. Thereafter, when and as directed, he would take them out of his deep freeze box and bring them back to defendant's plant. During these tests none of the cartons leaked. These tests were run between 10 A.M. and 11 A.M. It seemed the production of chile ceased about 12 noon each day. Hodge admitted that all the tests were made by his company and that Louvier had nothing to do with the tests. Hodge was then questioned and gave the following answers:

"Q. Did you on one occasion say that the only representation Mr. Louvier made was to bring these packages in and for me to test them to see if they would hold our product? A. That's correct.

"Q. So Mr. Louvier brought these packages in for you to test? A. That's right.

"Q. You made the tests? A. That's right.

"Q. And then you placed the order? A. That's right."

Hodge wanted the same carton as those tested, but of a different size. Louvier dictated the specifications of the cartons to Meentemeyer who prepared the order which Hodge signed. Hodge said he never did receive an acknowledgment of the order from plaintiff. The first shipment of 25,000 cartons was received by defendant. It paid for this shipment, together with the cost of the art work and engraving plates.

A short time after receiving this first shipment of cartons defendant started using them. During the filling and processing of these cartons the chile was cooked in 800 gallon vats at a temperature of 220° to 230°. It was then taken out of the vats and put in open tanks, out of which it was shoveled into a filling machine. The machine then filled the cartons. Hodge said this process dropped the temperature of the chile to 180° or 190° at the filling machine. Yates thought the temperature of the chile at the filling machine was 160° to 170°. After the cartons were filled they were immediately placed in shipping cases, twelve to the case. Thereafter, the shipping cases were placed in a cooler where they remained over night and the next morning they were taken to Merchants Refrigeration Co. for freezing and storage. The first cartons leaked when filled and processed as described. The leaking of the cartons was discovered the morning following the filling and the processing of them. Yates testified that 75% or more of the cartons leaked. Despite this knowledge defendant continued to fill and process the cartons. The filling of the cartons usually began at 9 A.M. and continued until noon.

Hodge called Louvier and told him the cartons leaked. Louvier and Nerenberg came to the plant of defendant and both made suggestions and tests, but none proved satisfactory. Hodge said Nerenberg put water in the cartons at a temperature of 130° to 140° and they leaked. Hodge and Meentemeyer testified that Nerenberg said: "Apparently someone has goofed at the office."

Nerenberg recommended that defendant put different inserts in the cartons. Defendant refused to do this because of the labor cost involved. Hodge admitted that plaintiff offered to make 100,000 new cartons with new liners and that he refused the proposition because plaintiff had refused to give defendant credit for what it had paid on the initial 25,000 cartons delivered. Hodge said he refused to accept the shipment of 75,000 cartons, which represented the balance of the cartons due under the order.

Defendant's principal reliance for reversal of the trial court's judgment is in the contention that there were two implied warranties: (1) that the cartons delivered pursuant to the order were reasonably fit for

the purpose for which they were to be used; (2) that the cartons shipped were up to the specifications of the sample carton delivered for testing purposes.

■ An implied warranty arises under certain circumstances by operation of law irrespective of any intention of the seller to create it. 46 Am.Jur., Sales, Sec. 332, p. 513. It is a creation of the law and by law it becomes a part of the contract as much as if expressly stated therein.

■ Addressing our discussion to the first of these alleged implied warranties, it is the general rule that, where an article is purchased for a specific purpose which is communicated to the seller, and the buyer relies upon the seller's skill, judgment and experience to furnish him with an article that will answer this purpose, or where the seller undertakes to supply goods manufactured by himself for a special purpose, which the buyer has no opportunity of selecting, there is an implied warranty that the article sold shall be reasonably fit for the intended purpose. London Guarantee & Accident Co. v. Strait Scale Co., 322 Mo. 502, 15 S.W.2d 766, 64 A.L.R. 936; Davies v. Motor Radio Co., Mo.App., 236 S.W.2d 409; Sperry Flour Co. v. De Moss, 141 Or. 440, 18 P.2d 242, 90 A.L.R. 406, 408; Grand Avenue Hotel Co. v. Wharton, 8 Cir., 79 F. 43; 46 Am.Jur., Sales, Sec. 346, p. 529; 59 A.L.R. 1188.

■■ However, the mere fact of knowledge by the seller of the purpose for which the buyer desired the article is not sufficient to show a reliance by the buyer upon the skill, judgment and experience of the seller to raise an implied warranty of fitness. 46 Am.Jur., Sales, Sec. 348, p. 532; 90 A.L.R. 412. Where the buyer understands what he wants and makes an independent examination of the product and tests the product in order to determine its fitness for the intended use, there can be no implied warranty of fitness for a particular purpose. Under the aforesaid circumstances the buyer does not rely on the seller's skill and judgment, but instead relies on his own judgment formed as a result of his examination and tests of the product.

■ The availability of an implied warranty of fitness depends on the facts showing that the buyer relied upon the skill, judgment and experience of the seller to select an article suitable for the buyer's needs. 46 Am.Jur., Sales, Sec. 348, pp. 532, 533; 90 A.L.R. 411.

■ In the instant case it is not difficult to determine on whose skill and judgment defendant relied when purchasing the cartons. The evidence in defendant's case shows, without a doubt, that the selection of the carton was made by defendant and that defendant did not rely on the skill, judgment and experience of the plaintiff to select a carton to fit defendant's intended use of same. There is nothing in the record of this case to justify a finding that defendant relied on the plaintiff to select a carton that would fit the use intended by defendant. Samples were submitted to the defendant for testing and the record shows no representations made by plaintiff that the samples would meet the requirements of defendant's demands. Hodge admitted that all the tests were made by his company and that Louvier had nothing to do with the tests. He admitted no representations were made by Louvier. That all Louvier did was to bring in the cartons for testing by defendant. Defendant admits it made the purchase on the basis of its judgment, formed as a result of the tests made. Defendant acting on its judgment cannot now be heard to cast the responsibility for the selection of the carton ordered on the skill, judgment and experience of plaintiff, the seller. Defendant tested the carton for a period of ten months and then executed its written order. Under the facts of this case there can be no implied warranty of fitness of the carton for the intended purpose. Miami Cycle & Manufacturing Co. v. National Carbon Co., 6 Cir., 268 F. 46; 46 Am.Jur., Sales, § 359, pp. 544, 545.

There is another rule which bars defendant's reliance on an implied warranty of fitness and it is, that where a known, described, and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described, and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. London Guarantee & Accident Co. v. Strait Scale Co., supra; Grand Avenue Hotel Co. v. Wharton, supra; Century Electric Co. v. Detroit Copper & Brass Rolling Mills, 8 Cir., 264 F. 49; 46 Am.Jur., Sales, § 352, p. 537; 90 A.L.R. 418.

In the instant case the defendant described with definiteness the carton he desired and in such case there is no implied warranty that the carton delivered in accordance with the description in the order will fit defendant's purpose. What we have just said is subject to the further understanding that plaintiff delivered cartons of the same specifications as the test samples submitted. We find there was no implied warranty that the cartons delivered pursuant to the order were fit for the purpose intended by defendant.

We next discuss defendant's contention that there was an implied warranty that the cartons shipped would be in accordance with the sample carton delivered for test purposes. There is some difference of opinion in the cases as to whether a failure to deliver merchandise in accordance with the specifications in the order is a breach of an implied warranty or merely a failure to perform in accordance with the terms of the order. We need not resolve this difference because the same effect is reached regardless of the rule followed. In the instant case the basic question is one of fact, i. e. whether the cartons delivered were the same as those submitted for the tests. If Louvier correctly described the specifications of the test sample when dictating defendant's order, it was the obligation of plaintiff to deliver cartons that would correspond with the description in the order.

In considering the contention of defendant now being discussed, we must be mindful of the fact that defendant tested the cartons for some time, before executing an order for same. When we keep this fact before us in a consideration of the substance of defendant's contention, it is plain that the only obligation plaintiff had was to deliver cartons that fitted the specifications of the cartons submitted for test purposes. If plaintiff made and delivered cartons that corresponded with the test samples submitted, it fulfilled all of its obligations to defendant. 46 Am.Jur., Sales, § 328, p. 510 and § 380, p. 559.

The evidence adduced by defendant fails to show that the cartons delivered pursuant to defendant's order were not the same (except for size) as those submitted for the tests. The sole reliance of defendant in support of his contention now under review is that the sample cartons submitted by plaintiff for test purposes did not leak, whereas, the cartons delivered pursuant to the order did leak. This, it contends, is proof that the respective cartons were not of the same specifications. This would be a circumstance in defendant's favor if there was no controversy about the respective methods used in the filling and processing of the cartons. Defendant contends that the method of filling and processing the cartons was the same in both instances. However, its own evidence does not support it in this respect. It is true defendant's evidence indicates the chile was put in the cartons at approximately the same temperature in both instances, but in the handling of the filled cartons thereafter, the same method was not used in both instances. In the test, the cartons, after they were filled with chile, were not placed in packing cases, twelve to a case, which was the procedure followed during the subsequent production runs. Instead, during the tests, the cartons, after being filled, were separated. This allowed better circulation of air around the filled cartons, serving to cool the cartons

more rapidly, whereas, in the production run, the hot cartons, after being filled, were immediately packed together in a case, allowing no circulation of air, thus taking longer to cool. Nerenberg testified it was the accepted practice in the frozen food field to freeze the package individually. The cartons were cooled and frozen individually when tested. This procedure was not followed by defendant in the subsequent production runs. This difference in procedures between the test runs and the production runs would account for the different results experienced.

Plaintiff's witnesses said the temperature of the chile when put in the cartons was not the same in both instances. These witnesses said the chile was "much hotter" when filling the cartons shipped pursuant to the order. They indicated this difference in temperature could account for the different results. We think that the explanation of why the production cartons leaked and the test cartons did not leak can be found in the testimony of Louvier when he said, "they were handled differently."

We said the evidence adduced by defendant fails to show that the cartons delivered pursuant to the order were not the same as those submitted for the tests. Nor does defendant's evidence show that the description of the "Frostofold" cartons given to defendant by Louvier at the time it executed the order was incorrect. On the other hand, the evidence adduced by plaintiff shows that the cartons delivered pursuant to the order were the same as those submitted for test purposes. The testimony of the employees of the United States Testing Company, Inc., shows there was no significant difference between the two sets of samples examined and tested by them. Nerenberg testified that the "Frostofold" samples sent to the United States Testing Company, Inc., were made to the same specifications as the test samples used by defendant. Obviously, the trial court believed plaintiff's witnesses in this respect and in doing so did not err. In this con-

nection we follow the mandate of Section 510.310 RSMo 1949, V.A.M.S., which cautions us to give due regard to the superior opportunity of the trial court to judge of the credibility of the witnesses. In doing so we find that the cartons shipped pursuant to the order were the same as the cartons submitted for test purposes (except for size) and that the cartons supplied complied with the specifications in defendant's order.

The final contention of defendant is that no contract existed. In this connection it states that the acceptance of its order was not unequivocal and unconditional, but that it amounted to a rejection of defendant's order and substituted a counter proposition. It points out that this counter offer was never accepted by it and thereby, under the law, no enforceable contract existed. We think it unimportant whether defendant did or did not receive or accept the acknowledgment of the order. Defendant contends that there were material qualifications contained in the acknowledgment. In our examination of the acknowledgment the only qualification that could be a possible modification of the defendant's order is the one set out in our statement of plaintiff's evidence. However, this portion of plaintiff's acknowledgment of order imposed no conditions on defendant's order that were not already imposed as a matter of law. The same conditions expressed in plaintiff's acknowledgment of order became a part of defendant's order by operation of law. The conditions were as binding on defendant as if expressly stated in the order.

In the case of Anchor Serum Co. v. Rea, 326 Mo. 811, 32 S.W.2d 587, loc. cit. 589, cited by defendant, the court when considering the applicability of certain government rules and regulations not set out in the contract under review, said: "It follows that said requirement must be held a part of the contract as if written therein."

A contract includes not only what the parties actually write down, but all those things which the law implies as a part of

it and all the matters implied by law are as binding on both parties as though actually written into the contract. 17 C.J.S. Contracts § 37, p. 371.

In another case cited by defendant, Columbia Malting Co. v. Clausen-Flanagan Corporation, 2 Cir., 3 F.2d 547, loc. cit. 549, the court said: "And it is equally well settled that, although the party to whom the offer is addressed adds new words to the proposal, the words added will not impair or prevent acceptance if they do not qualify in legal effect the offer. The added words in such cases do not prevent a binding contract from being formed."

The qualification set out in plaintiff's "Acknowledgment of Order" that the merchandise covered by the order was sold without warranties of any kind from seller would be true even though no acknowledgment of order had been mailed. It must be remembered that defendant's order did not call for an acknowledgment. If no acknowledgment was sent the cartons covered by defendant's order were sold without warranties of any kind as we have pointed out heretofore. We found that no warranty of fitness attached to defendant's order. We also found that the only obligation plaintiff had was to deliver cartons that complied with the specifications of the test samples. Nothing in plaintiff's acknowledgment modified or altered this obligation. Nor did it introduce any new terms not implied therein by law.

An acceptance of an offer may be by act and when plaintiff complied with the conditions of defendant's order it is a sufficient acceptance of the order. 17 C.J.S. Contracts § 45, p. 386. Williams v. Emerson-Brantingham Implement Co., Mo.App., 198 S.W. 425. Defendant accepted the first shipment made under the order.

We think plaintiff's manufacture and delivery of the cartons pursuant to the terms of defendant's order, including those terms which are implied as a matter of law, completes the contract. Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65

S.W.2d 1036, 1039; Cox v. A. P. Green Fire Brick Co., 230 Mo.App. 774, 75 S.W. 2d 621, 625. And this is true whether or not plaintiff forwarded the acknowledgment of order, because the acknowledgment merely expressed conditions that were impliedly imposed on the order as a matter of law.

Defendant cites numerous authorities which hold that an acceptance of an offer may not vary the terms proposed. With this we agree. However, as we have pointed out, we find the acknowledgment did not vary the terms of the order.

The trial court committed no error and its judgment should be affirmed. It is so ordered.

WOLFE, P. J., and ANDERSON, J., concur.