**PRICE BROTHERS LITHOGRAPHIC COM-
PANY, a Corporation, Plaintiff-Appellant,**

v.

**AMERICAN PACKING COMPANY, a Cor-
poration, Defendant-Respondent.**

No. 31348.

St. Louis Court of Appeals.

Missouri.

Oct. 15, 1963.

Rehearing Denied Nov. 29, 1963.

Schuchat, Cook & Werner, Charles A. Werner, St. Louis, for appellant.

Greensfelder, Hemker & Wiese, Mark R. Gale, St. Louis, for respondent.

BRADY, Commissioner.

The parties will be referred to by their designation in the trial court. Plaintiff's action sought recovery of the unpaid balance due for certain labels stored in plaintiff's warehouse which the plaintiff had printed pursuant to a sales contract with the defendant. The defendant denied that any money was due the plaintiff and set up certain affirmative defenses which will be specifically referred to later. The defendant's counterclaim sought recovery of the money paid for the labels already delivered, the cost of tests performed at defendant's plant, and damages. The jury found for the plaintiff in the sum of $5,365.00 for the unpaid balance due on the undelivered labels, and for the defendant in the amount of $120.00 representing the cost of 3 tests made at the plant. Judgment was entered accordingly. Defendant's timely motion for new trial was sustained by the trial court on the ground that it had erred in giving plaintiff's verdict-directing instruction 1. The issues presented by this appeal go beyond that point, however, as the defendant, being the party to whom the new trial was granted, contends the trial court erred in excluding certain testimony offered by the defendant and in admitting into evidence plaintiff's exhibits 5 and 6. These points are contained within the motion for new trial and thus are available to defendant in this appeal as grounds to sustain the trial court's award of a new trial. White v. St. Louis Public Service Co., 364 Mo. 111, 259 S.W.2d 795; Mo.Digest, Appeal and Error, ☞854(6). There are no issues presented in this appeal arising from the verdict for the defendant for the costs of the tests.

The defendant produced "Smoky Canyon Chipped Beef" in addition to its other products. This product consists of slices of beef placed in polyethylene pouches filled with nitrogen. These pouches are then sealed and labeled with a 5⅛" x 6⅜", three-color label by means of a heat sealing machine. Defendant had not experienced trouble with the labels supplied by one of plaintiff's competitors and consideration of price was the only factor bringing about the change to plaintiff's labels.

A brief summary of the pleadings will be helpful toward a clear understanding of the issues. Plaintiff alleged that it printed 2,000,000 labels pursuant to a sales contract signed by both parties and that plaintiff had fully performed its obligations under that contract. The petition then alleges demand for payment upon the defendant and the defendant's refusal to pay. Defendant admitted the contract and its refusal to pay for the labels, but pled that it was not indebted to defendant for any sum because defendant knew exactly what purpose these labels were to be put, the machinery and process that was to be used in accomplishing that purpose, and that " * * * defendant relied on the plaintiff to furnish labels suitable for such purpose and use; that the labels furnished by plaintiff pursuant to such order were not fit for the defendant's purpose or for the use to be made of them by defendant, nor were they fit for the purpose or use for which labels of that kind or description were generally intended; that as part of the contract referred to in paragraph 3 of plaintiff's petition, plaintiff impliedly warranted that said labels would be suitable for the purpose for which defendant desired the same and were to be as suitable to be used by defendant on defendant's machinery and equipment as were the labels procured from another source which defendant was using for the same purpose at the time said order was placed and said contract was entered into; and that, in addition, as part of the contract referred to in paragraph 3 of plaintiff's petition, plaintiff impliedly warranted that said labels would be suitable for the purpose and use for which labels of that kind and description were generally intended." Defendant's counterclaim alleged the payment of $133.65 for labels delivered under the contract and which defendant contended were worthless. The counterclaim also alleged plaintiff's agreement to pay all costs incurred by defendant in testing plaintiff's labels in the course of defendant's production and gave those costs at $1,500.00. The defendant also sought recovery for $1,973.46 which it al-

leged to be the difference in the cost of labels it had to secure to replace those furnished by plaintiff and the cost of plaintiff's labels had those labels been suitable " * * for defendant's purpose and use as plaintiff had impliedly represented and warranted they would be * * *."

Plaintiff's sales manager, Fisher, was contacted by a friend of his who was employed by the defendant concerning a bid from plaintiff on the printing of Smoky Canyon labels. Upon being informed of plaintiff's interest in submitting a bid, defendant's employee sent several sample labels and information covering them to Fisher. The next month Fisher flew to St. Louis for a meeting with the president of the defendant company. The discussion at that meeting is not of importance to the issues here involved, but at the close of the meeting Fisher was introduced to Harold Fulton, defendant's production manager, who took him to the label inventory area to get some representative labels imprinted with the names of the various distributors of Smoky Canyon Chipped Beef. Fisher testified that, while following Fulton to this area, he walked by the production lines but did not pay particular attention to them. On the other hand, Fulton testified that he briefly explained the production operation to Fisher as they walked along.

Upon his return to plaintiff's plant in New Jersey, Fisher had the samples given him by Fulton calibrated and ascertained that some of the labels were printed on 70 pound paper while others were printed on 80 pound paper. Fisher then telephoned the defendant's president, Mueller, who stated he would contact the present label supplier to ascertain what weight of paper was presently being used. Fisher then wrote a letter to Mueller, the pertinent parts of which follow:

"The purpose of this letter is to confirm the conversation we had in your office with regard to Price Brothers printing and Smoky Canyon Chipped Beef labels. These labels would be

printed on a 70 lb. coated two sides paper with coating that would make a complete seal with your polyethylene bag. The price of the labels would be $2.50 per M for both the blanks and the printed labels, for those we could make in multiples of 25 M and more. The price for the blanks together with the finished imprinting for those labels which are for less than 25 M would be $3.05 per M.

"Price Brothers would duplicate all existing Cheef and private labels which are presently in existence free of engraving and plate charges and we agreed that for all new private labels we would have a flat $75 per plate charge."

On May 13, 1960, Fisher made a second trip to defendant's plant bringing with him some sample labels for testing. The actual number of sample labels he brought and the procedures followed to test the labels is in dispute. Fisher's testimony was that he brought 10–12 identical sample labels which he gave to Fulton who then left the room for a few minutes; that Fulton returned with the sample labels attached to pouches filled with defendant's product; that the pouches were permitted to cool for a moment, were then tested, and all the labels were found to have satisfactorily adhered; and that Fulton then informed Mueller that the labels adhered satisfactorily. Whereupon Mueller told defendant's purchasing agent to prepare a purchase order for 2,-000,000 labels. On the other hand, Fulton's testimony was that Fisher brought about 250 sample labels with him which were in stacks of about 25 labels to each stack; that he and Fisher went to the production line where the labels were tested; that some of the labels adhered well and some did not; and that the labels that did adhere were stacked in a small box which Fisher took back to his New Jersey plant. A former employee of defendant also testified that Fisher was with Fulton when the sample labels were tested. However, it is undisputed

that after the tests the purchasing agent prepared the purchase order for the labels and gave it to Fisher personally.

Following Fisher's return to New Jersey with the purchase order, Mueller telephoned him and informed him that the present label supplier was using 80 pound paper. Fisher then wrote Mueller the following letter:

"Just a note to bring you up to date as to the progress on the Chief labels. We have experimented with the 70# paper which we used, and, even though the samples that I brought out to you seem to run satisfactory, we have decided on the basis of the information you gave me that your present source was giving you an 80# sheet, that this perhaps would make a tighter seal and be stronger on the package after it has been shipped from your plant. Therefore, we are taking the liberty of increasing your paper from 70# to 80# at no expense to you, and we feel that this will positively give you the satisfaction which you want.

"We still feel that the 70# paper would be heavy enough, however, there can be no uncertainty with the 80# paper and we are proceeding on that basis accordingly."

On or about June 13, 1960, plaintiff sent defendant an acknowledgment of its purchase order signed by plaintiff's vice president. This acknowledgment incorporated the change to 80 pound paper. On July 14, 1960, defendant's purchasing agent signed this acknowledgment and returned it to plaintiff. It did not contain any information as to the specific machines or equipment used to seal the labels nor the temperature ranges used by defendant. This signed acknowledgment is referred to in the transcript as the "sales contract" or "contract of sale" and will be so referred to herein

Plaintiff ran the 2,000,000 labels, inspected them, and placed them in the warehouse to await shipping instructions from defend-

ant. In August of 1960, plaintiff shipped 54,000 labels pursuant to defendant's instructions. Defendant's testimony was that many of these labels would not adhere to the pouches filled with chipped beef. This required the defendant's employees to open the pouches and return the chipped beef to the production line. Fulton testified that approximately 50% of the labels were not adhering to the pouches. He notified plaintiff who sent Fisher and Robert Craig, their sales representative, to St. Louis. However, on the day they arrived at the plant, labels printed by other suppliers were being used. At Fisher's request, some 20 of plaintiff's labels were placed in the production line and Fisher testified that there was " * * * some difficulty with the label adhering to the sealed bag." Fisher and Craig advised defendant's purchasing agent that the problem was a technical one on which they did not feel qualified to give advice. They secured his permission to have a technician from the firm supplying plaintiff with paper for the labels visit the defendant's plant. Fisher also secured 2 or 3 empty polyethylene bags which he gave to plaintiff's production manager.

Mr. Lingo, the engineer from the paper company, visited defendant's plant in September. He testified that during his visit Fulton took some of plaintiff's labels and inserted them in the machines. Lingo's testimony was that these labels adhered satisfactorily. On the other hand, Fulton insisted that on this occasion only 50% of the labels adhered satisfactorily while labels supplied by other printers and being run at the same time adhered satisfactorily. After repeated requests the defendant paid for the 54,000 labels that had been shipped in August but, although requested, it refused to give any instructions as to shipping the other labels. The defendant's purchasing agent then wrote plaintiff terminating the sales contract and plaintiff sent defendant a bill for the labels remaining in plaintiff's warehouse.

In the spring of 1961, plaintiff's representative visited defendant's plant on two occasions. What happened during the visits is in dispute. Craig, plaintiff's sales representative, testified he was at the plant on February 27, 1961. Defendant was then running labels printed by another firm. These labels adhered very well. Plaintiff's labels were then inserted and these also adhered very well for about 10 minutes. For the 10 or 15 minutes following, some of plaintiff's labels did not adhere to the pouches. On April 5th, Craig returned to the defendant's plant accompanied by Lingo, the paper company's engineer. On this occasion, both plaintiff's labels and those printed by a competitor were being run and both adhered satisfactorily. Fulton's testimony was that the occasion when Craig and Lingo came to the plant the labels did not adhere satisfactorily but the labels printed by others did. He described the trouble with plaintiff's labels as being without a pattern. As he put it, "For a period of time, possibly the first 10 minutes, they were running very fine, then all of a sudden the labels started to fall off. Not every one, but maybe one out of five, then it would get worse and then all of a sudden none would catch."

The president of the printing company supplying labels to defendant, John Tuchschmidt, testified that he was called to defendant's plant in August of 1960 by Fulton, defendant's production manager. On this occasion he observed that plaintiff's labels were not adhering while labels his company had printed were.

The deposition of Mr. Dreeben was read into evidence. Dreeben was formerly a production engineer with the manufacturer of the heat sealing machines used by defendant. His testimony was that on April 4, 1961 he conducted tests at the plant where the heat sealing machines are manufactured, using labels supplied by plaintiff's production manager and represented to be labels printed by plaintiff and those printed by a competitor. He used a total of approximately 25 labels in the test. The results were that both labels adhered satis-

factorily and that there was no difference in the results regardless of what labels were used. Based on his test, it was his opinion that " * * * there should be no difficulty —in adequately placing a header label of the type supplied by Price Brothers on the type bag used by American Packing Company." His testimony was that if both labels were run through the machine at the same temperature and one adhered and one did not, then that fact could only be accounted for by differences in the paper on which the labels were printed.

Plaintiff was permitted to introduce into evidence its exhibit 5 which was a letter from the defendant's purchasing agent requesting plaintiff to reconsider a specific condition of sale listed on the sales contract. This condition of sale required the defendant to hold plaintiff harmless from " * * * any and all violations of Federal and/or State Food, Drug and Cosmetic Laws, Flag, Trademark and Copyright Laws, or from any subject matter required by law or prohibited by law that Buyer authorized printed or lithographed on or omitted from goods." Plaintiff also introduced into evidence its exhibit 6 which was a follow-up letter asking plaintiff to reply to exhibit 5. Each of these exhibits was admitted into evidence over the defendant's objection that they were neither relevant nor material to any issue in the case.

Defendant's counsel repeatedly attempted to have Mueller, defendant's president, testify as to conversations he had with Fisher, plaintiff's sales representative, who negotiated the sales contract for plaintiff. Plaintiff objected to this testimony on the ground that it violated the parole evidence rule as it tended to contradict or vary the terms of the contract of sale. Paragraph 18 of that document reads as follows: "All understandings, either with Seller's representative or Seller, are merged herein, and the same is not subject to any alteration of specifications, orally or through an agent's act, except as approved in writing by an officer of Seller's company." The objection was sustained and the defendant thereupon made the following offer of proof:

"If the Court please, as an offer of proof, if the witness were permitted to respond to the last question addressed to him by counsel for the Defendant, the witness would state that in his conversations with Mr. Fisher Mr. Fisher informed the witness that Price Brothers would duplicate the label that American Packing Company was then using and that it would give satisfactory performance on the equipment of the Defendant and that Price Brothers was an experienced company in the label business. And further, that the price for the Price Brothers' labels would be substantially below what American Packing Company was paying to its then supplier for the same labels."

The transcript discloses that following this offer of proof, the court inquired of defendant's counsel if he was offering this testimony for the purpose of impeaching Fisher's testimony. Defendant's counsel replied that he was not as it was his recollection that Fisher had " * * * stated all these things in his testimony."

The plaintiff's verdict-directing instruction 1 required the jury to find that a representative of defendant contacted plaintiff with reference to a quote on labels to be used by defendant; that plaintiff quoted on the labels; that plaintiff submitted a label to defendant which defendant tested on its production equipment; that defendant ordered two million labels; and that after the order was placed, the defendant informed plaintiff that the labels it was presently using were printed on 80 pound paper. The instruction then reads as follows:

"3. That plaintiff thereafter prepared a written sales contract containing known, described and definite terms including quantity, description of label, price, cutting size of label, color, weight of paper, coating, terms and conditions of the contract, warehousing informa-

tion and delivery information; that an agent with authority to sign said sales contract signed on behalf of the plaintiff and that an agent with authority to sign said sales contract signed on behalf of defendant; and"

The instruction then hypothesized the production of 2,200,000 labels "* * * of the description in the sales contract"; the tender of the labels and demand of payment by plaintiff; and defendant's refusal to accept or pay for any of them except the one shipment of 54,000 labels. The final paragraph of that instruction follows:

"5. That if you so find from the weight of credible evidence the aforementioned facts, then you will find in favor of the plaintiff, and it will be your duty to return a verdict for the plaintiff and against the defendant and fix damages as per instruction 6."

As stated at the beginning of this opinion, the defendant urges three reasons why the trial court's order granting defendant a new trial should be affirmed. It contends that the trial court committed prejudicial error in the giving of instruction 1, in the admission of exhibits 5 and 6, and in sustaining plaintiff's objection to Mueller's testimony concerning his conversations with Fisher.

The defendant attacks instruction 1 upon 3 grounds. It contends the instruction ignores defendant's defense of implied warranty; that it is in conflict with defendant's verdict-directing instruction 3; and that the giving of this instruction constituted reversible error due to the use of the phrase "the weight of credible evidence." The argument advanced to support defendant's contention that instruction 1 wholly ignores the defense of implied warranty is that this instruction does not reach the issue of whether there was an implied warranty that plaintiff's labels would adhere to the polyethelene bags used by defendant and whether the labels did, in fact, adhere. The result, defendant contends, is that the jury was led to believe that plaintiff was entitled to a verdict even though it impliedly war-

ranted the labels would be reasonably suitable for defendant's purpose and even though these labels were not, in fact, suitable. We cannot agree.

The plaintiff relies upon the case of Interstate Folding Box Co. v. Hodge Chile Co., Mo.App., 334 S.W.2d 408, where this court at [1] and [2] stated the doctrine of implied warranty. At [5] on page 414 of 334 S.W.2d it was held that "The availability of an implied warranty of fitness depends on the facts showing that the buyer relied upon the skill, judgment and experience of the seller to select an article suitable for the buyer's needs. 46 Am.Jur., Sales, Sec. 348, pp. 532, 533; 90 A.L.R. 411." This court also held there can be no implied warranty where either of two factual situations is shown by the evidence to exist since the presence of either factual situation necessarily negates reliance by the buyer upon the seller's skill, judgment and experience. The first of these was where the buyer "* * * makes an independent examination of the product and tests the product in order to determine its fitness for the intended use, there can be no implied warranty of fitness for a particular purpose. * * *" Interstate Folding Box Co. v. Hodge Chile Co., supra, 334 S.W.2d l. c. 414[3, 4]. The defendant in the case at bar hastens to distinguish that case on the ground that in the instant case Fisher expressly acknowledged that none of the labels printed on the 80 pound paper were ever sent to the defendant for testing. In short, the fact is that in the instant case the labels tested were not the labels plaintiff furnished the defendant and for which it seeks payment. For this reason, defendant urges that in the instant case it cannot be held to have conducted such tests as would prevent reliance upon the seller's skill, judgment and experience. We agree. However, the defendant's argument leaves untouched the other factual situation which this court has held would prevent a showing of reliance upon an implied warranty of fitness and, as plaintiff contends, it is upon the existence of that factual situation the plaintiff bases its at-

tack upon the defense of implied warranty. In Interstate Folding Box Co. v. Hodge Chile Co., supra, 334 S.W.2d 1. c. 415[7], this court held:

"There is another rule which bars defendant's reliance on an implied warranty of fitness and it is, that where a known, described, and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described, and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. (Citing cases.)"

It is obvious that paragraph 3 of plaintiff's verdict-directing instruction 1 was drawn with the above-quoted ruling of this court clearly in mind. It is equally clear that paragraph 3 of instruction 1 hypothesizes the essential elements of a rule of law which this court has held will prevent reliance upon a theory of implied warranty. There is no contention that paragraph 3 of this instruction is not supported by the facts. There was never any dispute but that the requirements stated on the sales contract were fully complied with and that the defendant got the specific label described on that contract. That being so, it cannot be said that plaintiff ignored the issue of implied warranty. To the contrary, plaintiff's instruction hypothesized facts which were supported by the evidence and, if found by the jury, met the issue of implied warranty head on and prevented a recovery under such a theory. Interstate Folding Box Co. v. Hodge Chile Co., supra.

■ The defendant also urges that the giving of this instruction constitutes reversible error because it fails to specifically negate the defense of implied warranty as required by Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14. That same contention was presented in the case of Prevost v. Wilkin, Mo.App., 358 S.W.2d 417, wherein the court refused to extend the rule of the Moore case to a case involving the de-

fense of accord and satisfaction. In Prevost v. Wilkin, supra, 358 S.W.2d 1. c. 421, the court held:

"In the first place the Moore case specifically declares a rule where the defense is contributory negligence. We find nothing to indicate it is announcing an instruction rule for all affirmative defenses. It may be contended, as appellants contend, that logic makes the rule equally applicable to all affirmative defenses. But the Moore opinion does not say so. It has long been the law in Missouri that all of the instructions given should be read and considered together in order to determine if the jury was misled or misdirected. The Supreme Court in Johnson v. Flex-O-Lite Mfg. Corp., 314 S.W.2d 75, 81, said:

"'All of the instructions given in a case should be read together and as parts of a single charge in order to determine the correctness of the charge or the effect of any deficiency in a particular instruction. (citations)'.

"For this court to rule the case at bar as covered by the Moore opinion, would require us to go beyond its actual holding, by-pass the rule that all of the instructions be considered together and in effect further enlarge and extend the change promulgated by that opinion. We believe that if any such extension is made it should be by the Supreme Court rather than by this court."

The same considerations compel us to refuse to extend the rule of the Moore case to the instant case involving implied warranty.

■■ Neither can we hold this instruction erroneous because it is in conflict with instruction 3. That instruction embodied the defendant's defense of implied warranty. It hypothesized that plaintiff knew of the purpose for which defendant intended plaintiff's labels; that defendant relied upon the experience, skill and judgment of the plaintiff in ordering these labels; that the plaintiff's labels did not adhere to the poly-

ethelene bags; and that the defendant had to pay more for labels from its other supplier than it would have had to pay the plaintiff. Upon these findings, it directed a verdict for the defendant for the difference in the cost of the labels. It follows that instruction 3, hypothesizing facts to support defendant's theory of implied warranty, would necessarily conflict with plaintiff's verdict-directing instruction hypothesizing facts which, if found by the jury, would prevent recovery under such a theory. It was not erroneous to give the instruction for each of the parties was entitled to submit to the jury hypothesizations which, if found, authorized a recovery for it upon its theory of the case so long as the submissions made were supported by the evidence.

■ The defendant's argument with regard to its remaining attack upon this instruction is based upon the use of the words "weight of credible evidence" in the last paragraph of instruction 1. Plaintiff candidly admits that the phrase should have read "the greater weight of the credible evidence" but urges that whatever error was created by the omission was cured by the use of the correct language in instruction 2, the burden of proof instruction. That instruction informed the jury that the plaintiff had the burden of proving its case against the defendant " * * * by the preponderance or greater weight of the credible evidence"; that the defendant had the burden of proving its counterclaim " * * * by the preponderance or greater weight of the credible evidence"; and that "By the term preponderance or greater weight of the credible evidence as used in these instructions, the court means evidence which you think is more worthy of belief than that offered in opposition." There can be no doubt but that the burden of proof instruction was a correct statement. Bell v. Pedigo, Mo., 364 S.W.2d 613; Mo.Digest, Trial, ☞234(7). The effect was to supplement and explain the incorrect statement in the last paragraph of instruction 1. Perry v. Stockhoff Supply Co., Mo., 356 S.W.2d 92. We are not to be understood as approving

the language used by plaintiff, nor do we hold that in every case the use of the phrase here employed by plaintiff can be cured by other instructions. However, in the instant case, in view of the clear and repeated use of the correct terminology in instruction 2, we hold that the omission of the words "preponderance or greater" in instruction 1 does not render that instruction reversibly erroneous. We find no prejudicial error in the giving of instruction 1 and the trial court's award of a new trial to the defendant cannot be sustained on that ground.

■ Two other points contained in the motion for new trial were urged upon this court by defendant as basis for sustaining the award of a new trial. These have to do with the trial court's action in excluding Mueller's testimony regarding his conversations with Fisher and in admitting into evidence plaintiff's exhibits 5 and 6. These exhibits were letters from the defendant which plaintiff contended went to prove that defendant knew exactly what it ordered from the plaintiff by executing the sales contract. These points will not be ruled herein for the reason that it is well settled that any error in receiving or rejecting evidence will not cause a reversal where the verdict returned and judgment rendered were the only verdict and judgment which the law would uphold. Summers v. Peoples Elevator Co., Mo.App., 136 S.W.2d 81; Mo. Digest, Appeal and Error, ☞1056(6). Under the factual situation presented by this appeal, that is exactly the situation. As the defendant admits in its brief, "The facts hypothesized by that instruction [instruction 1] were not in dispute. If those facts alone authorized a verdict for plaintiff, then the trial court could—indeed should have directed a verdict for plaintiff." As we have stated earlier in this opinion, the facts hypothesized in paragraph 3 of instruction 1 are essentially those that this court in Interstate Folding Box Co. v. Hodge Chile Co., supra, held constituted one of the two situations preventing the buyer from proving his reliance upon the seller's skill, judgment and experience and thus from establishing

the defense of implied warranty. The existence of facts preventing the defendant from availing itself of the defense of implied warranty being uncontested, it follows that any error which defendant seeks to present by these last two assignments cannot be prejudicial.

The trial court's order granting a new trial should be set aside and the judgment for the plaintiff reinstated. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The cause is remanded to the trial court with instructions to set aside its order granting the defendant a new trial and to reinstate the judgment for the plaintiff.

RUDDY, P. J., WOLFE, J., and WILLIAM M. KIMBERLIN, Special Judge, concur.