PRICE BROTHERS LITHOGRAPHIC COMPANY, a Corporation, Plaintiff-Appellant,

v.

AMERICAN PACKING COMPANY, a Corporation, Defendant-Respondent.

No. 50548.

Supreme Court of Missouri,

En Banc.

Sept. 14, 1964.

Schuchat, Cook & Werner, Charles A. Werner, St. Louis, for appellant.

Greensfelder, Hemker & Wiese, Mark R. Gale, St. Louis, for defendant-respondent.

PER CURIAM.

After an opinion by the St. Louis Court of Appeals this case was transferred here from that Court by our order of transfer. Section 10, Article V, Constitution of Missouri, V.A.M.S. The opinion of the St. Louis Court of Appeals appears at 372 S.W. 2d 138.

This is an action to recover the amount due for certain printed food package labels ordered from and printed by plaintiff allegedly in accordance with a sales contract between the parties. The labels were being held in plaintiff's warehouse awaiting prearranged shipping instructions from defendant when defendant cancelled the order for reasons hereafter mentioned. We will continue to refer to the parties by their designation in the trial court. In its answer defendant admitted all material allegations of plaintiff's petition and raised as its affirmative defense the existence and breach of an implied warranty of fitness of the labels for defendant's particular use. On verdicts of the jury judgments were for the plaintiff for $5,365 and for defendant for $120 on the latter's counterclaim. We are not concerned on this appeal with defendant's counterclaim. Defendant's motion for a new trial was sustained on the ground that the trial court erred in giving plaintiff's verdict directing instruction No. 1, and the judgment for plaintiff was set aside and defendant granted a new trial on plaintiff's claim. Plaintiff's appeal to the St. Louis Court of Appeals followed. That Court remanded the case with directions that the trial court set aside its order granting the defendant a new trial and reinstate the judgment for the plaintiff. We reach the opposite result.

By the pleadings the issues were reduced to whether or not there existed an implied warranty of fitness of the labels for defendant's use and, if so, whether that warranty was breached. The case was tried on the assumption and theory that these were the main issues to be determined, and plaintiff recognized this in the very beginning of the trial by offering evidence thereon as a part of its case in chief. This being so, and for reasons hereafter given, it was error prejudicial to defendant to submit plaintiff's case upon the theory hypothesized in its verdict directing instruction which authorized and permitted recovery in total disregard of (by failure to even mention) these, the only real issues in the case.

A summary of the pleadings and a statement of the evidence, including summaries of testimony of the witnesses, appear in the opinion of the Court of Appeals at pages 140 to 143 of 372 S.W.2d, inclusive. We have the benefit of the transcript, briefs filed in the Court of Appeals, and Supplemental Briefs filed and oral arguments presented here.

The plaintiff contends that the court erred in sustaining the defendant's motion for new trial. In addition to the specific reason mentioned in the trial court's order sustaining the motion for new trial defendant preserves for review and urges points that the trial court erred in the admission and exclusion of certain evidence.

From the evidence we conclude that the facts are: Plaintiff is engaged in the business of manufacturing or producing printed paper labels for attachment to food containers. Defendant is engaged in the business of selling meat products to distributors and retailers. It prepares the meat products and packages them in clear plastic polyethylene containers which are then sealed with heat. To this container there is attached by heat sealing across one end a three-colored 5⅛″ x 6⅜″ paper label describing the contents of the container and displaying the trade name of the meat product as well as the name of the producer and, in some instances, the distributor. For some time defendant had been using labels printed by another which were satisfactory and adhered properly to defendant's containers. Learning that plaintiff was a qualified and experienced producer of labels and would furnish the same

quality label for defendant's particular pur-poses at less cost than defendant had been paying, defendant entered into a contract with plaintiff agreeing that plaintiff would produce two million labels for defendant and hold and warehouse them subject to the latter's understood needs and shipping instructions. Before the contract was signed by the parties defendant had furnished plaintiff with samples of labels it had been using which plaintiff agreed to duplicate. Plaintiff examined and analyzed the sample label furnished it by defendant, prepared the contract purporting to describe a like label on 80 pound paper, and then printed and warehoused the labels. Plaintiff knew that for the label to be of value to defendant it must adhere to defendant's polyethylene container by sealing. Prior to printing, processing and warehousing, none of the printed labels as a completed product were examined or tested by defendant. Receiving shipping instructions, plaintiff removed from its warehouse and shipped 54,000 of the labels to defendant, for which shipment plaintiff was eventually paid. Defendant placed these labels in its production line for attachment to its containers filled with food. Many of these labels—too many according to defendant—would not adhere to the containers. Defendant immediately notified plaintiff of this fact. Thereafter over a period of several months many and various tests of the labels and the paper on which they were printed were made by plaintiff or by others at its direction. Plaintiff's witnesses testified that in these tests the labels did adhere to defendant's containers; defendant's witnesses testified to the contrary. Because the labels would not adhere to its containers defendant wrote plaintiff terminating the contract; plaintiff sent defendant an unavailing statement for the labels remaining in its warehouse, and this action followed. An explanation as to why labels of this type would not adhere comes from one of plaintiff's witnesses who said that if labels printed by different companies were intermingled, and one company's labels adhered satisfactorily and the other's did not, then either there is a difference in the label stock or in the temperature setting of the machinery which applied the labels to the containers. Another explanation comes from one of defendant's witnesses who was defendant's label supplier prior to the contract with plaintiff and at the time of the trial its present supplier. This witness said that his company had experimented with paper coated with offset enamel which has a special hard sizing in its coating to make it suitable for lithographic process of printing and paper coated with letter-press enamel which does not have as hard sizing in its coating; that paper coated either for lithographic or letter-press printing could be used, but his experience was that labels printed on paper coated with the special hard sizing would not adhere satisfactorily to polyethylene bags while those printed on letter press paper would.

We consider that the testimony of plaintiff's witness, Maurice B. Fisher, is significant on the issue of whether an implied warranty of fitness existed. Here we have plaintiff's sales promotion manager, a salesman with all that common everyday experience tells us that honored title means. His duties are not those of the art department, the analysis and testing department, or the production department. He is concerned primarily with finding, selling to and maintaining satisfied customers. The beginning of plaintiff's negotiations with defendant was through a communication received by Mr. Fisher the first part of March, 1960, from his business friend, Mr. Ed. Hupp, a sales promotion representative of defendant, that the latter would like to have plaintiff furnish quotations on prices of their label products. With his letter Hupp sent Fisher two or three sample copies of labels being used by defendant. As a result, we find Fisher at the St. Louis office and plant of defendant on two occasions before the sale contract is entered into. On the first occasion, March 29, he met his friend, Hupp, who took him

to the office of Mr. William G. Mueller, President of defendant. It was there this salesman explained and related to Mueller and Hupp the 130 years of continuous life and international business of Price Brothers in the manufacture and production of labels for food product containers to be distributed to the consumer, his employer's many customers for whom it produced labels, his employer's type of operation and equipment, its production facilities and methods of printing labels for food packages, as well as the fact that his employer could, and the "ways" it would duplicate and produce defendant's present label in large quantities at a much cheaper price than the latter's present supplier. There can be no reasonable doubt that at this meeting these representatives of the parties discussed the specific and special purpose for which the labels were to be used and the necessity that the label adhere to the polyethylene bag containing defendant's meat products. Fisher said they discussed this matter, and shortly after his return home he wrote Mueller giving further evidence of this discussion. On April 8 he wrote confirming their discussions as to Price Brothers' printing and American Packing Company's labels. He went on to say, "these labels would be printed on a 70 lb. coated two sides paper *with coating that would make a complete seal with your polyethylene bag.*" (Emphasis ours.)

To this first meeting with defendant's officers Fisher took with him a drawing or sketch of a label prepared by plaintiff's art department slightly revised in art design from the label sample previously furnished him by Hupp. It was on this occasion he met Mr. Harold Fulton, defendant's production manager. At the close of the visit with Mueller, Fulton took Fisher downstairs to secure for Fisher samples of labels defendant would have printed for and supply to its various distributors and to walk through and observe and have explained to him the function and operation of defendant's production line, all of which Fisher says took about

three minutes. On his return to plaintiff's home in New Jersey, Fisher had an analysis made to determine the paper weight of the sample labels furnished him by Fulton at the March meeting and found it to vary between 70 and 80 pounds. He informed Mueller of this variance by telephone who said he would check with his then present label supplier and further advise Fisher. It was not until after the next meeting of these parties that Mueller informed him the supplier was furnishing 80 pound weight paper and on June 10 Fisher acknowledged this information by letter to Mueller. This letter and its significance will be referred to later.

In the meantime plaintiff secured from its supplier sheets of stock of 70 pound weight paper, coated on both sides, represented by Fisher as being the same as the samples furnished him. These were cut into pieces the same size as the labels then being used by defendant.

These label size unprinted pieces of paper were taken by Fisher to his May 13 meeting in St. Louis with Mueller and other representatives of defendant, when Mueller told him "they had decided to give us some of the business" and an order for two million labels was prepared and handed Fisher. During this visit Fulton and Fisher took these unprinted label size paper sheets downstairs where they were run through the production line, the result being that some adhered to the packaged bags and some did not. Those that did adhere were placed in a box and given to Fisher, and then Fulton and Fisher retired to Fulton's office where they prepared a list of defendant's customers for whom the latter would have special labels printed and determine the overall total number of labels required for a given period of time.

As related above, it was after this meeting that Mueller informed Fisher that defendant's label supplier had been furnishing 80 pound paper, and it was thereafter that Fisher wrote his June 10 letter in which he states, in substance: We have experi-

mented with the 70 pound and have decided that 80 pound paper perhaps would make a tighter seal and be stronger on your package; that his company felt that this would positively give defendant the satisfaction it wanted; that although his company felt 70 pound paper would be heavy enough there could be no uncertainty with the 80 pound paper. The labels were printed, processed and warehoused on July 26 and 27 and, in early September, after the labels were "run" on defendant's production line, Fisher returned to defendant's plant where he said he observed that some of the labels did not adhere.

Defendant contends that the plaintiff's verdict directing instruction No. 1 was erroneous because (1) it failed to hypothesize the issues of the alleged existence and breach of an implied warranty of fitness of the labels for defendant's particular use, and therefore ignored that defense, (2) it failed to negative the pleaded, proven and submitted affirmative defense of breach of implied warranty, and therefore was in conflict with defendant's verdict directing instruction No. 3, and, (3) it directed the jury to return a verdict for the plaintiff on the weight, rather than the preponderance or greater weight, of the evidence. A summary of instruction No. 1 is to be found in the opinion of the St. Louis Court of Appeals at pages 143–144 and of instruction No. 3 at pages 145–146 of 372 S.W.2d.

The very heart of the case and the crucial point on which it turns is whether or not, under the facts, a jury could find there was an implied warranty of fitness of the article purchased for defendant's particular use and purpose. If there existed an implied warranty of fitness, the next question that would follow in course would be whether there was a breach thereof.

■■■ The circumstances under which the law will imply a warranty as a part of a contract of sale have been long well-established. When an article is ordered from the manufacturer or producer thereof to be produced for a particular use or purpose, this seller knowing the use to which it is to be put, and the article is produced and sold for that use, there is an implied warranty the article is fit for that use where the buyer relies, and under the circumstances had reason to rely, on the seller's experience, skill and judgment. A fair presumption is that the manufacturer or producer, as distinguished from a distributor or retailer, knows the make-up and qualities of the materials and ingredients of the article and the processes of its production and is or should be informed of any faults in or characteristics of his materials or processing which would prevent its reasonably satisfactory use for the purpose for which it is intended. Such presumption is partly justified by the fact that the manufacturer or producer by his occupation holds himself out as competent and qualified to produce articles reasonably adapted to the purposes for which such or similar articles are designed and used. Therefore, when the buyer has no opportunity to examine or test the finished article before delivery of his order it is unreasonable to say that he relied and bought on his own judgment, or that he did not rely on the experience, skill and judgment of the seller. London Guarantee & Accident Co., Limited, of London, England v. Strait Scale Co., 322 Mo. 502, 15 S.W.2d 766, 768, 64 A.L.R. 936; Busch & Latta Paint Co. v. Woermann Construction Co., 310 Mo. 419, 276 S.W. 614; Interstate Folding Box Co. v. Hodge Chile Co., Mo. App., 334 S.W.2d 408; Lee v. J. B. Sickles Saddlery Co., 38 Mo.App. 201; Skinner v. E. F. Kerwin Ornamental Glass Co., 103 Mo.App. 650, 77 S.W. 1011; 46 Am.Jur., Sales, page 541, Section 356; 77 C.J.S. Sales §§ 325a and b, pages 1176, et seq. Where, however, the buyer examines or tests the article to determine its fitness for his intended use it would not be reasonable to say he relied on the judgment of the seller; instead, he would be relying on his own judgment. The reference in this rule to the opportunity of the buyer to examine or test refers to the article in its ultimate

or finished state; not to the unfinished article. O. L. Gregory Vinegar Co. v. National Fruit Canning Co., 167 Ark. 435, 268 S.W. 598, 1. c. 601. The evidence in this case is that the only examination or test that could be said to have been made by defendant was of plain white sheets of paper cut to the required size by plaintiff unprinted and unprocessed and not in their ultimate or finished state; and that many of these did not adhere.

Plaintiff contends that the above rule does not apply under the facts here and it invokes the rule, "[T]hat where a known, described, and definite article is ordered of a manufacturer [or producer], although it is stated by the purchaser to be required for a particular purpose, still, if the known, described, and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer." Interstate Folding Box Co. v. Hodge Chile Co., supra; London Guarantee & Accident Co. v. Strait Scale Company, supra; Century Electric Co. v. Detroit Copper & Brass Rolling Mills, 8 Cir., 264 F. 49; Grand Avenue Hotel Co. v. Wharton, 8 Cir., 79 F. 43. Plaintiff submits this rule in instruction No. 1. It contends that, considering the facts, the rule precludes reliance by the defendant on an implied warranty of fitness of the labels for defendant's use. In other words, plaintiff urges that the label described in the contract of sale prepared by it is a known, described and definite article within the meaning of that rule and that it tendered that particular article; and, therefore, there was no implied warranty by plaintiff the article would be fit for its known intended use. The rule urged by plaintiff applies to known, that is, well-known or commonly used articles, described and specifically definite articles. As to such articles the knowledge of the buyer of the suitableness for his particular use of well-known and commonly used articles is presumed to be just as good as that of the seller. The doctrine of implied warranty rests in part upon the principle of superior knowledge and experience of the seller over the buyer. It cannot prevail where obviously such superiority does not exist. Berger Mfg. Co. v. Crites, 178 Mo.App. 218, 165 S.W. 1163; London Guarantee & Accident Co. v. Strait Scale Co., supra. Obviously the plaintiff as an experienced producer of labels, possessed superior knowledge over the defendant food packager pertaining to the adhering qualities to polyethylene bags of the various types of printing and paper coatings it could use in the production of labels. As to such processes and materials plaintiff knew that defendant was compelled to rely on its experience, skill and judgment. With samples of labels being used by defendant with satisfaction in its possession, with knowledge of the use to which they must be put to function as a *label* on defendant's food package in the sense the italicized word is commonly used, with knowledge of the use to which this particular label must be put, with knowledge of the type container to which the article to be produced by it must attach and "make a complete seal with", this plaintiff, representing itself to be and no doubt being, a manufacturer with a great many years of experience in the production of food package labels distributed in international commerce, prepared the contract of sale executed by the parties describing in its own words the label it proposed to duplicate. It is true plaintiff described a *label*—a well-known and commonly used article—and it described its size and paper weight. But a *label* fails in its inherent function for which it is intended to be used when it fails to attach and adhere to the container the contents of which it is designed to identify and describe, and at that point it is not a label. It is a label when it identifies and describes the content of the container of which it is a part by adhering. In Lee v. J. B. Sickles Saddlery Co., supra (38 Mo.App. 1. c. 206), a case similar to that presented here, the author had occasion to quote from a rather succinct statement of Lord Ellenborough in Gardiner v. Gray and we quote an apt portion of those words, "The purchaser cannot

be supposed to buy goods to lay them on a dung-hill." This purchaser could not be supposed to buy labels to lay them on the city dump, and unless they would adhere to defendant's package they would be good for little else. Here the plaintiff contracted to produce and sell an article of its own description to be used by the buyer for a known particular purpose; not just any article fulfilling that description, but one fit for the buyer's particular purpose. The purpose for which the defendant required the label, i. e., to describe its product with a label securely attached to its product's container, is the essential matter and the essence of plaintiff's undertaking; not the label itself. Hunter v. Waterloo Gasoline Engine Co., Mo.Sup., 260 S.W. 970, 1. c. 972.

■ The St. Louis Court of Appeals in Interstate Folding Box Co. v. Hodge Chile Co., supra, (334 S.W.2d 1. c. 415) narrowly states the known, described and definite article rule relied upon by plaintiff. The rule is broader than as stated in the Hodge Chile case for although an article is desired for a particular purpose known to the seller, where the buyer justifiably relies upon the seller's skill and judgment to furnish him an article suitable for his purpose, then a warranty of fitness is implied, even though the article is one known, described and definite. Williston on Sales, Volume 1, Sections 230 and 236; Davenport Ladder Co. v. Edward Hines Lumber Co., 43 F.2d 63 (8th Circuit, 1930).

■ The evidence would warrant the jury in believing and finding, (1) that the defendant was compelled to and did rely on the experience and skill of the plaintiff, and (2) that the label was purchased for a particular purpose known to plaintiff, and we hold the case falls under the rule that "where a manufacturer contracts to supply an article which he manufactures to be applied to a particular use of which he is advised, so that the buyer necessarily trusts to the experience, skill and judgment of the manufacturer, there is an implied warranty that the article shall be reasonably fit for the use to which it is to be applied." And the evidence would warrant the jury in believing and finding that there was a breach of the claimed warranty. Instruction No. 1 submitted by plaintiff does not reach the issues tried; it purported to cover the whole case, but ignored and totally disregarded the issues of whether there was an implied warranty and, if so, whether there was a breach of that warranty. Instruction No. 1 should have gone further; it should have submitted these issues and required a finding thereon favorable to plaintiff as a predicate to a verdict for the plaintiff. Instruction No. 3, submitted by defendant, covering these issues, does not cure these omissions in plaintiff's verdict directing instruction. In fact, the two instructions are inconsistent and conflict with each other. Instruction No. 1 permits the jury to return a verdict for the plaintiff without finding against the defendant on the implied warranty issue; it permits a finding for the plaintiff irrespective of the fact that the jury may have also believed that the labels were purchased for a particular purpose known to plaintiff, that defendant was compelled to and did justifiably rely on plaintiff to supply labels for that purpose, and that the labels were not suitable for that use and purpose. The jury is left in a dilemma as to which of the conflicting instructions it should follow. Taylor v. Farmers Bank of Chariton County, 349 Mo. 407, 161 S.W.2d 243; Royle Mining Co. v. Fidelity & Casualty Co., 161 Mo.App. 185, 142 S.W. 438; Bixler v. Wagster, Mo. App., 256 S.W. 520; Perry v. Van Matre, 176 Mo.App. 100, 161 S.W. 643; Friend v. Jones, Mo.App., 185 S.W. 1159. The giving of Instruction No. 1 was error prejudicial to the defendant and the action of the trial court in setting aside the verdict and granting the defendant a new trial on plaintiff's claim for the reasons given by the court was proper. Because of this holding, it is unnecessary that we discuss the other points urged by defendant as error in Instruction No. 1, or its points as to the ad-

mission or exclusion of certain evidence, for it is unlikely these questions will arise on another trial.

The action of the trial court in setting aside the verdict and judgment for the plaintiff on plaintiff's claim and granting the defendant a new trial is affirmed and the cause is remanded for a new trial.