**BRADFORD MILLS, INC., a corporation, Plaintiff-Appellant,**

**v.**

**VIC–GENE MANUFACTURING COMPANY, a corporation, Defendant-Respondent.**

**No. 24847.**

Kansas City Court of Appeals.

Missouri.

April 1, 1968.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 3, 1968.

Application to Transfer Denied
Sept. 9, 1968.

Donald F. Price, Kansas City, for appellant.

Robert J. Mann, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for respondent.

MORGAN, Judge.

Plaintiff filed suit for $869.44 alleged to have been the balance due from defendant for labor provided in manufacturing approximately 2,000 dozen orlon ladies sweaters. Defendant counterclaimed by asserting the sweaters were defective because they did not conform to the sample, were not merchantable and were not reasonably fit for their intended purpose. A jury was waived and judgment was entered for plaintiff on the petition in the . amount prayed for plus interest, or $1,032.43. Defendant did not appeal. Judgment was also entered for defendant on its counterclaim in the amount of $6,374.83, and plaintiff has appealed. Being a court tried case, our review will be governed by Rule 73.01(d), V.A.M.R.

Defendant, Vic-Gene Manufacturing Co., is engaged in manufacturing and selling jackets, skirts, shirts, blouses and pants in Kansas City, Missouri. An order was received from Sears-Roebuck & Co. for a women's coordinated group (blouse, skirt and sweater). Vic-Gene did not make sweaters and planned to have them made by some other manufacturer. They obtained a sample sweater from Sears and contacted a purchasers' representative, Nelmar Associates, in New York City. Nelmar, in consideration of a 5% commission, was to "handle all of the details" of having the sweaters made. The sample sweater was forwarded to Nelmar by Vic-Gene. Nelmar, as agent for Vic-Gene, contacted plaintiff, Bradford Mills, Inc. of New York, to negotiate an agreement for Bradford to manufacture 1,000 dozen orlon sweaters. Nelmar advised that the per unit cost would be less on an order of 2,000 dozen, and Vic-Gene authorized an order for that number with Bradford to receive $14.90 per dozen for its labor. Bradford did not provide the yarn, and Nelmar purchased for Vic-Gene from Pharr Yarns, Inc., the estimated volume of yarn required. Nelmar then arranged for it to be dyed different colors by Royal Yarn Dying Corporation and shipped to Bradford. The costs of both the yarn and dyeing were billed directly to and were paid by Vic-Gene. All parties agree that Vic-Gene was the actual owner of all of the yarn at all times of interest here. The preliminary planning and final agreement for the work in question took place during the month of June, 1963. Bradford used all of the yarn and it actually produced 2,260$\frac{9}{12}$ dozen sweaters. It seems agreed in the industry that production from yarn in bulk is based on estimates and the overage is not an issue. All except 26 dozen were shipped to Vic-Gene by December 11, 1963. The 26 dozen were stolen from the plant of Bradford during the week end of October 5 to 7, 1963. Vic-Gene paid all statements submitted by Bradford after deducting $869.44 for the 26 dozen stolen and not received. This amount represented $387.40 for labor ($14.90 x 26) plus $482.04 that represented Vic-Gene's expense in purchasing and dyeing the yarn. This case began on August 18, 1964, when Bradford

filed suit for the amount deducted. On October 13, 1965, Vic-Gene filed its counterclaim and the trial was had on December 27, 1966.

Much of the evidence offered by both Bradford and Vic-Gene pertained to the factual outline set out above, and only that portion of the testimony and proof will be detailed, which is specifically pertinent to the questions that will arise.

Bradford first offered its president as a witness. He testified they had no direct contact whatever with Vic-Gene, and dealt entirely with Nelmar. He described Nelmar as, " * * * a firm in New York who represents different people who don't know where to place the orders for manufacturing of sweaters into New York market. They are agents of these different companies. They purchase the yarn for them, expedite the orders, check the quality and perform functions for the companies they represent." He identified Bradford's Exhibit No. 1 as the original order, dated June 27, 1963, which provided "2,000 dz., ¾ sleeve, Orlon Cardigan, as sample." He identified a letter from Vic-Gene to Nelmar (Plaintiff's Exhibit No. 4) which read: "This letter will confirm our phone conversation authorizing you to purchase enough yarn for approximately 2,000 dozen orlon sweaters same as the sample you have been working on." He related details of the burglary. He was asked, "Now, as these sweaters were being manufactured were they inspected by anybody?", and answered: "Yes, Nelmar Associates. This was their function. They were down at the mills and they kept inspecting the goods prior to shipment * * * three, four times a week." He testified his company received no complaints from either Nelmar or Vic-Gene until the counterclaim was filed two years later in October, 1965. All of their statements for labor had been forwarded to Nelmar. On cross-examination he was asked: "Did you observe them (Nelmar) sampling these sweaters?" His answer was: "Oh, yes. I went with them, stretching, checking, looking at them." He ex-

plained that Nelmar had regular inspection teams. He further said he warned Nelmar, when they discussed the sample, that it called for an open stitch and in a "cut and sewn" garment some variation of resistance to pull could be anticipated. Briefly, it apparently depended on where the thread happened to catch the yarn.

Plaintiff, without objection, read in the record that allegation of the petition declaring " * * * at all of the times herein mentioned * * * Nelmar * * * was agent * * * of defendant," and also the admission of its truth in defendant's answer.

Plaintiff rested after reading some portions of the deposition of Vic-Gene's president. It confirmed there had never been any direct contact between Vic-Gene and Bradford, and that all negotiations were handled by Nelmar. Instructions to Nelmar were stated as follows: " * * * gave them a sample sweater and told them that we were giving them an order for 2,000 dozen sweaters, have them made up like the sample" and "We gave them the sample and they were to have this sweater manufactured for us."

Defendant first called the laboratory manager of the Kansas City Testing Laboratories. He had never tested knit sweaters before but checked 5 given him by defendant on December 22, 1966. He described how he tested the shoulder seam by attaching the yarn on one side of the seam to a block and that on the other side to another block. By spreading the blocks, tension was created and measured. He reported the following result on each of the first 4 tested: A thread pulled out at 5½, 16½, 14 and 4½ pounds pressure, respectively. The fifth did not pull out with 35½ pounds pressure. He was allowed to testify that the temperature and method of storing for over three years could have affected the result. This opinion, however, is not helpful in view of the absence of testimony as to the method of storing for three years.

The president of Vic-Gene testified relative to the operations of the company. We must assume Vic-Gene was to manufacture for Sears all of that portion of the coordinated group except the sweaters. Upon a friend's recommendation, he had contacted Nelmar because, " * * * they are in the business of having sweaters manufactured for companies like mine." The sample was furnished Nelmar. The delivered price for material, labor and commission was $35.22 per dozen plus freight. He said, "I contacted Neil Weiss (Nelmar), and he told me that he would for a commission of five per cent, would handle all of the details of the manufacturing of the sweaters." With exception of the 26 dozen stolen sweaters, all were received by Vic-Gene. All except 675 dozen were shipped to Sears for $42.00 a dozen. Evidence of return invoices was offered which indicates Sears returned and was given credit for 164 of the sweaters sold to them. After these returns, no further shipments were made except 25 dozen to a Bargain Store for a reduced price of $27.00. Those found to have weak seams were repaired before this last sale. He explained the expense of such an inspection and required repairs. Spot checks were made near the time of trial and after finding many defective, the samples were selected for the testing laboratory and trial exhibits. On cross-examination, an effort was made to establish that Vic-Gene had only an order for a thousand dozen sweaters from Sears and had merely over ordered to get the cheaper per sweater costs, and those on hand were the result of having no outlet. This insinuation does not appear to have been proven. Nor is it obvious a demand was present for the entire 26,808 made. When specifically asked, "Were they (Nelmar) supposed to inspect the sweaters?", the answer was, "I do not know." He testified that no complaint was ever made to Nelmar or Bradford. Of those returned, the cause was indicated on the invoice. They generally were: knit pulled out at neckline, thread rotten, buttonhole defective or seam pulled. At this time, he stated the sample was only for styling, but agreed there was a complete absence of communication between Vic-Gene and Nelmar or Bradford as to any specifications whatever pertaining to the quality of the sweaters. He affirmed an answer previously given in a deposition that complete reliance had been placed with Nelmar. He further said, "We got no warranties from anybody." On redirect an effort was made to show the 675 dozen still on hand could have been sold if no defects had been found. He concluded by saying the problem was limited primarily to the white sweaters and estimated 200 of the 675 dozen on hand were white.

■ At the conclusion of the trial, an extended memorandum was filed by the trial court. Judgment was entered for Bradford for the balance due for making those sweaters that had been stolen on a theory of a mutual benefit bailment. As such a bailee, Bradford was not an insurer of Vic-Gene's yarn and with no showing Bradford failed to exercise ordinary care, the loss fell on Vic-Gene as bailor. 8 C.J.S. Bailments § 26, p. 387. With no appeal, this finding is not challenged. On the counterclaim, it was determined that Bradford impliedly warranted the sweaters would be reasonably fit for their intended purpose, and after allowing for 164 returned, loss on 25 dozen sold to the Bargain Store, repairs to those on hand and loss of profit on the 200 dozen white sweaters remaining, entered judgment for Vic-Gene against Bradford for $6,374.83.

Bradford in this appeal basically asserts the trial court erred because a manufacturer of an article according to sample only warrants the delivered product to conform to the sample, and that a full and complete inspection of the sweaters by Nelmar, as agent for Vic-Gene prior to delivery, concluded the contract, and absent fraud by the manufacturer or latent defects in the product, no complaint can be registered at this late date. Vic-Gene contends the sweaters did not conform to the sample, were not merchantable, nor were

they reasonably fit for their intended purpose, and that the judgment should be sustained on proof of one or all of such theories. Vic-Gene, by brief, further argues Nelmar had no authority to inspect and denied, "* * * Nelmar's agency extended to the outer limits demanded by appellant (Bradford)." Both briefs presented here include arguments pertaining to the correct measure of damages.

 There is no necessity in this case to review the well established rules of law that pertain generally to warranties both express and implied. The scope of their application has long been established both by text authority and continuing reported cases in this state. A proper decision under the facts presented here does not require their restatement. However, there are, surprisingly enough, few reported cases in this state wherein it was determined that a sale was in fact made by sample alone. Voss v. McGuire, 18 Mo.App. 477; Schoenberg v. Loker, 88 Mo.App. 387; 25A Mo.Dig. Sales ☞271. In many instances a sample might have been considered during the negotiations, but it was found that other statements and commitments were made by the parties which created express warranties or were sufficient for the imposition of implied warranties. From the evidence outlined above, both by the seller and buyer, it is shown that the companies involved in this case never had any direct communications. Vic-Gene had forwarded a sweater to its agent Nelmar in New York. On several occasions both by deposition and by testimony at trial, its president said that they only wanted sweaters conforming to the sample. During the later stages of the trial he did at one time say the sweaters were exhibited solely for purposes of style and not as to quality. However, no effort was made to show that this thought was conveyed to its agent Nelmar or Bradford. The president of Bradford testified the sweaters were as per the sample. In Schoenberg v. Loker, supra, turkey callers were ordered by sample, and it was held, "In such circumstances the law implies a

warranty on his part to make them according to the sample." In Interstate Folding Box Co. v. Hodge Chile Co., Mo.App., 334 S.W.2d 408, an order was made for cartons in which to pack chili. The court stated, "* * * it is plain that the only obligation plaintiff had was to deliver cartons that fitted the specifications of the cartons submitted for test purposes." See also 77 C.J.S. Sales, § 318. Under the record made, we can only conclude the parties contracted solely with reference to the sample. This created an express warranty of conformity. 46 Am.Jur., Sales, Sec. 363, p. 547. The results of the laboratory test and the sweaters displayed in the court room, both at the trial and appellate level, are of little value in reaching a correct result in this case. With what were or could the exhibits be compared? The original sample was not presented at the trial for purposes of comparison. If we were to speculate its very use as a sample destroyed it, we would look for at least an effort to describe its specifications, characteristics, resistance to pull or any other slight hint that might in some way give this or any other court a standard by which to consider those delivered. Although the sample was shown to have come from such a highly reputable firm as Sears, in view of Vic-Gene's contention that they at least handled on this occasion some 18,780 defective sweaters, we hesitate to create our own description of the sample for fear a similar incident could have occurred before. On this point, there was a complete failure of proof. We need only determine who had the burden. Williston on Sales, Burden of Proof, Section 255, p. 677, says, "If the buyer accepts delivery of the goods except for the mere purpose of inspection, he thereupon becomes liable for the price. Any right that he may have to refuse to pay the price in whole or in part, whether given effect to by recoupment or otherwise, is in its nature a cross right on the part of the buyer. He, therefore, in such a case has the burden of establishing that the goods are not equal to sample if the existence of his cross right depends upon that fact." In Branson v. Turner, 77 Mo. 489, 494, after

**602**

finding a delivery, the court held that the party asserting a total or partial failure of consideration by virtue of a breach of warranty had "the laboring oar as to this issue." The failure to meet this requirement must be charged to Vic-Gene.

 Even if we accepted the arguments of Vic-Gene and permitted impingement of either of the warranties suggested onto the actual issues developed in the record, the result could not be changed. The one controlling factor in this case is the issue of inspection and the mandatory implications arising therefrom. Nelmar was identified as an established agency experienced in performing the very task performed by it as shown by the evidence. It is uncontradicted that the finished product was examined and approved by it. There is no showing of a reliance on Bradford by either Vic-Gene or their agent Nelmar. Without reliance we need not guess as to which of the parties had superior knowledge. Southwest Distributors, Inc. v. Allied Paper Bag Corp., Mo.App., 384 S.W.2d 838. Absent fraud of the seller or latent defects in the product, not discoverable by inspection, the reported cases conclude that an inspection of the finished product completes the transaction. 46 Am.Jur., Sec. 370, p. 371; 77 C.J.S. Sales § 315b; Price Brothers Lithographic Co. v. American Packing Co., Mo., 381 S.W.2d 830, 835. No latent defects were shown. The ultimate effect of inspection is stated in 77 C.J.S. Sales § 187b (3), page 928: "The determination of the inspector that the goods conform to the sample is conclusive in the absence of fraud."

Vic-Gene now asserts the agency of Nelmar did not contemplate inspection although its president testified they were to handle all details. The evidence clearly reveals Nelmar to have been the acknowledged agent and representative of Vic-Gene. Even though we were to ignore the obvious, we could not find otherwise in view of the pleadings admitting such agency. The legal result is nothing more than a mandatory conclusion that Vic-Gene itself had inspected and approved of all sweaters delivered. Nelmar is not a party to this action, and it would be futile to discuss the possibility they might have been careless in the performance of their duties.

Judgment on the counterclaim is reversed.

All concur.